636 A.2d 32

**Kevin E. KENNELLY, et ux.**

v.

**Scott E. BURGESS, et al.**

**No. 539, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Jan. 27, 1994.

172

Leo Wm. Dunn, Jr. (Dunn & Emig, P.A., on the brief), Greenbelt, for appellants.

David A. Levin (Daniel C. Costello and Wharton, Levin, Ehrmantraut, Klein & Nash, P.A., on the brief), Annapolis, for appellees.

Argued before ALPERT, BLOOM and HARRELL, JJ.

HARRELL, Judge.

Kevin E. Kennelly and his wife, Lynette Kennelly, appellants, sued Scott E. Burgess, M.D., and his medical enterprise, Scott E. Burgess, P.A., appellees, for medical malpractice arising from a surgical procedure performed by Dr. Burgess on Mr. Kennelly. On 21 October 1991, appellants' claim was heard before a Health Claims Arbitration Panel. The panel found in favor of Dr. Burgess. Appellants rejected the panel's decision and subsequently filed suit in the circuit court. A

jury in the Circuit Court for Anne Arundel County (Lerner, J. presiding) returned a verdict in favor of Dr. Burgess. Thereafter, the Kennellys noted a timely appeal to this court.

## ISSUES

On appeal, three issues are raised [1]:

I.    In a medical malpractice case, it is reversible error to instruct the jury that an unsuccessful result following medical treatment is not evidence of negligence where expert medical testimony relies on such a result to support its opinions regarding negligence.

II.   It is reversible error for the trial court to fail to instruct the jury that an expert witness, because he is an expert witness, can aver negligence from the results of the medical procedure.

III.  It is error to permit an economist to use net income, adjusted for the effect of taxes, rather than gross income in computing lost wages, either accrued or prospective.

Based on our review of the experts' testimony at trial and the applicable law, we hold that the trial court's charge to the jury did not constitute reversible error. Because we find no error in the trial court's instructions, the verdict will stand. Therefore, we need not address appellants' third assertion on appeal.

## FACTS

On 11 May 1988, Dr. Burgess, an otolaryngologist (specialist in the treatment of the ear, nose, and throat), admitted Kevin Kennelly into North Arundel Hospital to perform that day a surgical procedure to relieve Kennelly's medical condition, which Burgess had diagnosed as chronic sinusitis. The intended surgery was described as a bilateral intranasal ethmoidectomy. In this procedure, the surgeon removes the mucuous membranes of the ethmoid sinuses, via the left and right

---

1.  At oral argument, appellees' counsel withdrew a previously filed Motion to Strike Appellants' Reply Brief.

passages of the nose. The ethmoid sinuses run up to the roof of the nose, called the fovea ethmoidalis. The fovea ethmoidalis, a delicate bone tissue, is attached to the dura, the protective coating of the brain. This bone tissue, which experts who testified in the case *sub judice* characterized as "eggshell" or "paper" thin in its normal, healthy state, is essentially the only barrier between the ethmoid sinus cavity and the brain.

There are two methods by which otolaryngologists may perform a bilateral intranasal ethmoidectomy, the conventional or classical technique and the endoscopic method. When the conventional or classical method is employed, the surgeon mechanically spreads the nasal opening and, utilizing only a head-mounted light to illuminate as much of the nasal cavity as can be visualized or his sense of touch where he cannot see what he is doing, removes the diseased tissue with an instrument called a Blakeslee forceps. When the newer, endoscopic method is employed, the surgeon inserts an instrument called an endoscope up into the nasal cavity. The endoscope is an optical instrument that allows the surgeon to illuminate and visualize on a video monitor in the operating room areas of the nasal cavity not as readily observable via the conventional method. The surgeon then removes the diseased tissue under direct observation. Dr. Burgess performed Mr. Kennelly's surgery using the conventional or classical technique.

On the morning of the surgery, Dr. Burgess informed Mrs. Kennelly that he expected the surgery to last approximately one hour to one hour and one-half. He reassured her that he had performed this surgery on several occasions. Approximately two and one-half hours after Mr. Kennelly was taken into surgery, Mrs. Kennelly spoke to Dr. Burgess. He informed her that "all went well except that there was a lot of excess bleeding."

On the following day, 12 May 1988, however, it became apparent that all had not gone well with Kennelly's surgery. The hospital contacted Mrs. Kennelly at home to inform her that her husband was not recovering properly. When she

arrived at the hospital, Mrs. Kennelly observed that her husband "was highly agitated, he had no orientation whatsoever as to where he was, he didn't know our daughter's name, he didn't know where we lived. The only person or thing that he knew was me."

On that day, several tests were performed to detect the cause of Mr. Kennelly's condition. A CAT scan revealed an abnormality in Mr. Kennelly's brain and bleeding that extended into the intracranial cavity. The pathologist's report stated that portions of bone and brain were found in the specimens routinely taken during and examined following surgery.

Dr. Burgess called in Dr. David Tolner, a neurosurgeon, to review Mr. Kennelly's situation. After reviewing the CAT scan and examining the patient, Dr. Tolner opined that Kennelly had suffered a stroke during the operation. He was also concerned about surgical "penetration into the cranial cavity," causing spinal fluid leakage into the sinuses of the nose. On the same day, he made arrangements to have Kennelly transported to Johns Hopkins Hospital to be seen by another neurosurgeon specialist, Dr. Haring Nauta.

An angiogram ordered by Dr. Nauta detected an irregularity in an artery located in the brain. A second angiogram confirmed the existence of an aneurysm. Dr. Nauta then performed a bifrontal craniotomy, during which he clipped the aneurysm and repaired the damaged artery. In addition, Dr. Nauta lifted and realigned portions of the brain that had herniated through the fovea ethmoidalis into the ethmoid sinus. He also repaired a cerebral spinal fluid (CSF) leak.

Following the operation, Dr. Nauta informed both Dr. Burgess and appellants that he had found "a definite penetration of the brain." He further opined that Mr. Kennelly sustained organic brain damage and that the condition was permanent. Dr. Nauta believed that the damage would prevent Mr. Kennelly from returning to work as a business executive.

In accordance with the Health Claims Arbitration Act, Md.Cts. & Jud.Proc.Code Ann. § 3–2A–04 (1989), appellants filed a claim against appellees with the Health Claims Arbitra-

tion Panel, alleging that Dr. Burgess negligently violated the acceptable standard of surgical care in his performance of the ethmoidectomy. On 13 November 1991, the Panel issued its ruling in favor of Dr. Burgess.

On 10 December 1991, appellants filed an action to nullify the Panel's ruling against them in the Circuit Court for Anne Arundel County. A classic "battle of medical experts" ensued at the trial, which began on 30 September 1992. The segments of the medical experts' testimony relevant to this appeal are recounted below.

Dr. Nauta testified that, when he performed the bifrontal craniotomy, he also made an examination of the floor of the skull cavity and saw two neatly nibbled defects in the bone. According to Dr. Nauta, there were identical holes on both the right and left sides that measured approximately one centimeter.

When questioned by appellants' counsel about his observations of the ethmoid roof (fovea ethmoidalis) during the operation, Dr. Nauta testified to the following:

Q: Doctor, observing the holes that you saw on the ethmoid roof, do you have an opinion, with a reasonable medical probability, as to whether or not those particular holes could have ... were probably caused by an operating instrument?

A: Well, I ... I think they clearly were, because they were tiny little scallopings with the bone being thick enough that I didn't ... didn't think it had just eroded itself in that manner.

Q: Your word ... you used the word "nibbled," in other words ...

A: Well, the diameter of the scallop in the curvature is the same in each case as if the same instrument had nibbled it in each little ... little bite. So, there was a little edge all along, a serrated edge, if you will.

Dr. Ferdinand Rodriguez, an associate pathologist at North Arundel Hospital, testified that when he examined tissue

specimens taken by Dr. Burgess from Mr. Kennelly's ethmoid sinus area, he found "ethmoid mucosal tissue, ... bone, ... and pieces of brain." He testified that the ethmoid mucosal tissue he examined displayed "mild, chronic inflammation." Dr. Rodriguez specified that the brain tissue found contained both grey matter from the superficial part of the brain, and white matter from the deeper portion of the brain containing the brain fibers.

Dr. Rodriguez further testified that he found both hard and soft bone fragments. Appellants' counsel then questioned him regarding the existence of any bone inflammation:

Q: Now, relative to the bone, itself, that you examined, did you find any evidence of any inflammatory process concerning the bone?

A: The bone was not involved in any inflammatory process.

Q: In other words, I understand the bone, itself, was free of any type of disease.

A: Yes, that's right.

Dr. Rodriguez further stated that there was no way for him to ascertain whether the bone fragments he examined were, in fact, portions of the fovea ethmoidalis. Indeed, he acknowledged that the bone may have been septation fragments.[2]

Dr. James Stankiewicz, a physician engaged by appellants to opine as to Kennelly's treatment, was qualified by the court as an expert in otolaryngology. Dr. Stankiewicz stated that, prior to his testimony at trial, he reviewed "records from the North Arundel Hospital, a few of the records from Johns Hopkins Hospital, the neurosurgical information and the hospitalization," as well as the deposition testimony of Dr. Burgess and his standard of care experts.

---

**2.** Dr. Rodriguez did not explain what a septation was. According to Dr. Mattox, an expert called by appellees, septations of bone are "bony walls within the ethmoid sinus" which are removed during the ethmoidectomy procedure because they obstruct the ethmoid cavity. No expert at trial definitively identified the bone fragments analyzed by Dr. Rodriguez and later reviewed by other expert witnesses as belonging to the fovea ethmoidalis.

Relying specifically on some of the records he reviewed, Dr. Stankiewicz explained to the jury the factors he believed to be indicative of Dr. Burgess's negligence. He testified that his review of a CAT scan of Mr. Kennelly's brain, taken prior to the ethmoidectomy, did not depict the existence of extensive disease. He stated that he saw "a little bit of disease" in some regions of the ethmoid sinus, but otherwise failed to detect "a lot of disease" in the picture.

Furthermore, upon examination of Dr. Burgess's operative report, Dr. Stankiewicz stated that, unlike the procedure used by Dr. Burgess, it was his practice to "remove the middle turbinate at the beginning of the procedure [ethmoidectomy] to get better visualization." The middle turbinate is one of three pieces of bone attached to the inner surface of the wall of the nose. The middle turbinate separates the inferior and superior passageways within the nasal cavity from the middle passageway. According to Dr. Stankiewicz, a failure to remove the middle turbinate increases the difficulty of the procedure, because it "decreases visualization," causing a "mechanical obstruction that you have to look around in order to ... to get at an area."

Later during his testimony, Dr. Stankiewicz referred to several CAT scans taken following the surgery on 12 May 1988. In particular, he highlighted one CAT scan that depicted two distinct defects in Mr. Kennelly's fovea ethmoidalis and cribiform plate. He also stated the scan showed an area "filled with postoperative change, it could be blood clot, which is probably what it is down in this area, and it's hard to tell here what's going through those defects." Dr. Stankiewicz attributed the defects depicted in the CAT scan to "intraoperative injury.".

Finally, before rendering his opinion on direct examination by appellants' counsel, Dr. Stankiewicz focused on the bleeding associated with the ethmoidectomy in question. He concluded that the loss of 1,200 cc's of blood was "way beyond what you would expect, in a case with disease such as he [Mr. Kennelly] had, which was moderate disease."

As framed in a question posed by appellants' counsel, Dr. Stankiewicz, "based on the investigations" that he made, concluded that Dr. Burgess's conduct during Mr. Kennelly's ethmoidectomy fell below the standard of care required of a reasonably competent otolaryngologist performing the procedure in question. Dr. Stankiewicz precisely defined how Dr. Burgess failed to meet the standard by stating the following:

> My opinion is that at the time of the surgery on Kevin Kennelly that Doctor Burgess went through the fovea ethmoidalis, cribriform plate area and entered into the brain, and this is not within the standard of care for that surgery.

Thus, Dr. Stankiewicz deduced that in performing the ethmoidectomy on Mr. Kennelly, Dr. Burgess penetrated through the fovea ethmoidalis, the roof of the ethmoid sinus, and inserted forceps directly into the brain, where it was resting in its normal position.

On cross-examination, Dr. Stankiewicz acknowledged differences between the method by which he currently performed an ethmoidectomy and the method by which Dr. Burgess performed Mr. Kennelly's ethmoidectomy in 1988. Dr. Stankiewicz admitted that, in 1988, "there were different schools of thought" concerning whether it was necessary to remove the middle turbinate.

In this regard, appellees' counsel also pointed out Dr. Stankiewicz's prior testimony before the Panel concerning operating in the roof of the ethmoid without removing the middle turbinate:

Q: Question: "So, if you didn't remove it initially, and then were working in the roof of the ethmoid, it is difficult to see and most of the procedure in that area is done by feel. Is that right?"

A: That's right.

Q: Answer: "That's right." Question: "And that gets you into the area of judgment as to where you were and exactly what you were removing. Is that right?"

A: That's right.

Appellees' counsel then shifted the focus of cross-examination to how Dr. Stankiewicz arrived at his conclusion that Dr. Burgess's performance during the operation in question fell below the standard of care:

Q: And you now know that this is a drawing done by Dr. Nauta of his findings right after he did the surgery.

A: All right.

Q: Is that right?

A: Yes.

\* \* \* \* \* \*

Q: And that these boxes represent the area where he found the defect?

A: Yes.

Q: Is that your understanding of where they were?

A: If you look at the x-ray back there which I showed you earlier, that pretty much correlates.

\* \* \* \* \* \*

Q: Now, in ... if I understand you correctly, when you're talking about your view of the standard of care, you can remove, and I don't mean this in a derogatory sense, but in doing this procedure, there can come a time when this roof part can come ... be removed by the operator.

A: That can happen in the process of doing the procedure.

Q: All right. And when that happens in and of itself, that is not a deviation from the standard of care as you understand it to be.

\* \* \* \* \* \*

A: I said it is not provided you recognize it and stop.

Q: Is it your view ... well, let me ask you; has that occurred to you from time-to-time?

A: Sure.

Q: Have you always recognized the leaks?

A: Yes.

\* \* \* \* \* \*

Q: So, it's your view, . . ., that in every case where you had intruded into the bone and hit . . . pulled out the bone, you recognized it, knew about it, and dealt with it.

A: In the situation where I was in there and I was removing disease and I pulled bone out, and I could see it, yes I recognized it. . . . [w]hen I'm in operating, if I can see it, then I stop.

Q: Well, I understand that. If you can see it, you would stop. But it . . . that's doing it endoscopically. Is that right?

A: Yes.

Q: But you might not see it if you were doing a regular, I don't want to use classical, but an intranasal ethmoidectomy without the endoscope.

A: There's probably a good bet that you wouldn't see it.

\*    \*    \*    \*    \*    \*

Q: And if, in fact, you removed the bone in that area as I understand it, the dura [protective lining of the brain] sticks to the bone.

A: The dura in that area can be fairly adherent to the bone.

Q: Meaning sticks to as I—

A: Meaning sticks to.

Q: So, that when you take the bone, the dura may very well come with it.

A: There's a good chance you may get some dura. Sometimes not but it may occur.

Q: And, if that occurs, again using the type of operation that Doctor Burgess was doing, you may not know it and you would get a leak or it might leak at that time or it might leak later. Is that right?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: And would it be fair to say if that occurred, in your view, using the procedure that he was using, it would not

be a deviation from the standard of care if, in fact, once he found out there was a leak, he went in and treated it?

     \*     \*     \*     \*     \*     \*

Q: All right. So, in your view then, it would be a grey area. Is that right?

A: That's right. It's a . . . it depends on what the outcome is with the patient.

Q: All right. So, if you could fix it without too much problem for the patient, it wouldn't be a deviation from the standard of care but if you have to do a big operative procedure, then it would be a deviation from your point of view?

A: I think from that standpoint, that's fair.

During a brief re-direct examination, Dr. Stankiewicz referred to Dr. Tolner's report concerning the breakdown of Mr. Kennelly's white and red blood cell count. He stated that the dramatic increase in white cells following the ethmoidectomy indicate "inflammation . . . and . . . and some injury somewhere and some potential of infection."

Appellees' counsel, on re-cross examination, questioned Dr. Stankiewicz concerning the position of the brain when a portion of the fovea ethmoidalis is removed:

Q: Doctor, if we were to assume that the defects were where they are shown on Doctor Nauta's note and as I understand it the brain is sitting right on top of there, is that right?

A: On top of the—

Q: Roof of the ethmoid.

A: —roof of the ethmoid, yes.

     \*     \*     \*     \*     \*     \*

Q: And if a portion of the roof is removed, then you would agree that the brain can come down into the ethmoid sinus cavity itself. Is that right?

A: Depends on how much. If you've got a small opening, it isn't going to come down. But if you've got a large opening, then yes, that can happen.

Q: The fact of the matter is that in this case, one possible scenario is that that's, in fact, what happened; the brain, using your word, pooched down in there and the operator actually can be inside the ethmoid sinus cavity itself remove ... and actually strike it. Is that right?

A: Well, despite the fact that you want to ... you would want to know that and keep an eye on how far you are because you can judge a lot of those distances, that can occur.

Q: That has occurred. Isn't that true?

A: I don't know specifically that that has occurred but it certainly can occur.

Q: All right. And you don't know one way or the other whether that, in fact, occurred in this case.

A: To be honest with you, I don't know exactly the size of the defect and whether it made the brain more accessible or not.

Dr. Burgess presented the testimony of two otolaryngologists to refute the statements made by Dr. Stankiewicz attributing negligence to Dr. Burgess. Each testified that, in his opinion, Dr. Burgess' performance during Mr. Kennelly's operation conformed to the appropriate standard of care required for a bilateral intranasal ethmoidectomy performed without the use of an endoscope.

First, Dr. Douglas E. Mattox, also recognized by Dr. Stankiewicz as a leader in the field of otolaryngology, was so qualified as a medical expert by the court. Based on his review of Mr. Kennelly's history of chronic sinus problems, Dr. Mattox believed that Dr. Burgess employed the "reasonable and necessary operative procedure" on Mr. Kennelly. Dr. Mattox also explained to the jury the effect that chronic sinus disease can have on the bones in the area of the sinuses of the skull:

A: Well, it's ... different in every case, but certainly, chronic infection can lead to some softening of the bone or some thinning of the bone, or if it's reactive, even some thickening of the bone.

Q: Were you able to determine one way or another, based on your review of these X-rays, as to what effect, if any, the chronic sinus disease that you observed in Mr. Kennelly had with respect to the bones and the sinuses?

A: Not in great detail. The CT Scans, of course, ... take a volume of tissue and condense it into a single picture, and so I did not see, for instance, a big hole in the bone between the sinus and the intracranial cavity. The bone is so thin anyway that I cannot determine from the ... from the scans if it's thinned more than normal because much of this bone is paper thin to start with.

Q: With respect to the bone in the area that we're concerned with in this case, can you tell the members of the jury, based on your experience, the average thickness that one would find in that area?

A: One millimeter or less.

Q: And a millimeter is, if you were going to make an analogy to something ...

* * * * * *

A: Thickness of your thumbnail.

As Dr. Stankiewicz had acknowledged during his cross-examination, Dr. Mattox stated that when operating in the ethmoid sinus area using a head-mounted light and the Blakeslee forceps, that "to a certain extent, you have to rely on your judgment of the angles that you're working and by feel."

During the ensuing dialogue with appellees' attorney, Dr. Mattox expressed his opinion regarding whether Dr. Burgess had met the requisite standard of care when performing the ethmoidectomy on Mr. Kennelly:

Q: Doctor, ... based on your review of these materials that you told the jury about, all of the operative materials, everything, can you express an opinion as to whether or

... to a reasonable degree of medical probability as to whether or not during the performance of the surgery on May 11, 1988, the intranasal ethmoidectomy, Dr. Scott Burgess acted as a reasonably competent otolaryngologist with respect to the procedure that he did?

A:  I do.

Q:  And what's your opinion?

A:  I believe that he did so act.

Q:  The case that we're here on is because apparently, during the course of this procedure, something happened. Can you tell the jury why you think, even though that occurred, Dr. Burgess acted as a reasonably competent doctor when he did the surgery?

A:  Well, I believe that ... that the procedure was indicated and that he had the patient's overall best interest at heart, and I believe that he identified certain landmarks that you can identify in the nose, the nasal septum which the ... center portion of the nose, the middle turbinate, the ethmoid bulla, that he used appropriate equipment, that he used appropriate illumination, and that he performed the procedure as ... as a reasonable person would.

\*     \*     \*     \*     \*     \*

### [REFERRING TO THE COMPLICATIONS IN KENNELLY'S SURGERY]

Q:  Doctor, do you have an opinion that you can express to a reasonable degree of medical probability as to how the incident occurred?

\*     \*     \*     \*     \*     \*

A:  I believe that the bone in this area was very thin and although Dr. Burgess was following the landmarks that he had, he removed some of that bone, and then once the bone is gone, there's ... there's no protection to anything inside.

Q:  Now Doctor, do you have to actually penetrate the ... area inside the brain or ... well, do you?

A: Well, it's ... there are two potential mechanisms. Either you physically go inside the cranial cavity with the forceps, ... or as the bone has been removed, the brain is allowed to ... to fall down into the sinus cavity where ... where some fragments were removed.

In Dr. Mattox's opinion, therefore, Dr. Burgess's conduct during the ethmoidectomy did not fall below the standard of care, because, under the circumstances, it was not unreasonable for him unknowingly to remove portions of the fovea ethmoidalis.

In contrast to the opinion provided by Dr. Stankiewicz, Dr. Mattox stated that it was not unusual for a patient suffering from chronic sinus inflammation to lose a thousand cc's of blood when undergoing a bilateral intranasal ethmoidectomy on each side of the nose. In this regard, Dr. Mattox also expressed his opinion to a reasonable degree of medical probability that the bleeding described by Dr. Burgess during Mr. Kennelly's operation did not, as appellants contended, derive from an injury to the right cerebral artery in the brain. According to Dr. Mattox, such an injury could not have been controlled by medical sponge packing, and would have caused a "lethal event right on the operating table."

Dr. Bruce Jafek, also recognized by Dr. Stankiewicz as a leader in the field of otolaryngology, was also qualified by the court as a medical expert and testified on behalf of appellees. Like Dr. Mattox, Dr. Jafek stated that, in his opinion, Dr. Burgess's conduct during the operation in question had not deviated from the requisite standard of care. In this regard, Dr. Jafek stated:

A: Yes, in my opinion, he acted as a reasonably competent otolaryngologist during the performance of that surgery.

Q: And why do you hold that opinion, Doctor?

A: He had properly evaluated Mr. Burgess [sic] in terms of history. He had properly tried additional course of antibiotics. He had properly obtained the appropriate X-rays to evaluate the extent of pathology. He found that,

he obtained surgical consent, and he went ahead and conducted the operation.

\* \* \* \* \* \*

Q: Dr. Jafek, where we left off, according to my note, was we were talking about whether or not this was the type of complication that could occur even in the hands of the most skilled surgeon.

A: Yes, sir.

Q: And did you have an opinion in that regard?

A: Yes, sir. This can occur in the hands of the most skilled surgeon.

Appellees' counsel then questioned Dr. Jafek concerning his interpretation of the standard of care in medical malpractice cases in relation to the interpretation provided by appellants' standard of care expert, Dr. Stankiewicz:

Q: Now my question is, do you have an opinion that you can tell this jury as to whether or not the standard of care for a reasonable competent physician is determined by what the doctor does as opposed to what the outcome is for the patient?

A: Well, I think that that's an unusual description of a standard of care. If we were to dictate a standard of care by outcome, anytime that you had a ... a bad outcome, that would mean that you didn't adhere to the standard of care.... The standard of care, as I understand it, is what a reasonably prudent doctor would have done under similar circumstances, and that's my understanding of what Dr. Burgess did in this case.

Like Dr. Mattox, Dr. Jafek emphasized that, in his opinion, the bleeding which occurred during Mr. Kennelly's operation was neither excessive nor arose from an injury to the right cerebral artery. Dr. Jafek also demonstrated to the jury, using the human skull, the normal thinness of the fovea ethmoidalis.

Next, Dr. Jafek stated his opinion, based on Dr. Nauta's operative notes, concerning what happened to Mr. Kennelly's brain during the ethmoidectomy:

Q:  Are you able to express an opinion to a reasonable degree of medical probability as to whether or not an instrument such as a Blakeslee forceps entered into the cavity where the brain is, or if the roof of the ethmoid was removed and the brain dropped down?

*    *    *    *    *    *

A:  Yeah, it would be my opinion to be more likely that the ... with the removal of the roof of the ethmoid that the brain was down.  It is not my opinion that the instrument was inserted up into the brain cavity.

[EXPLAINING DR. NAUTA'S OPERATIVE NOTES]

Q:  With the brain herniating down into it?

A:  Yes.

Q:  Now what does that mean?

A:  Well, herniating, or course, is extending down, dropping down in, possibly extending, herniating, moving.  It's in an unusual location for the brain.

Q:  And then he describes that he went to the other side and he found a symmetrical opening herniating down on the opposite side.

A:  It sounds like the brain was down on both sides into the ethmoid cavity.

Finally, Dr. Jafek, although not a pathologist, examined the slides taken by Dr. Rodriguez of the specimens taken from Mr. Kennelly by Dr. Burgess during the surgery, over the objection of appellants' counsel, and concluded that the "little bony fragments" detected in the specimens contained "some acute and chronic inflammatory cells which you can't see at this magnification."  According to Dr. Jafek, the bone fragments were specimens "which you would normally expect ... in this kind of operation."

Dr. Jafek could not establish to a reasonable degree of medical probability, however, based on his examinations of the CAT scans and Dr. Nauta's notes, whether Mr. Kennelly's fovea ethmoidalis was thin or eroded. He could only conclude that some defect in the fovea ethmoidalis, caused either naturally or by a subsequent removal by Dr. Burgess, allowed Mr. Kennelly's brain to herniate into the cavity of the ethmoid sinus area. This herniation, in turn, resulted in Dr. Burgess's penetration of those portions of Mr. Kennelly's brain that had settled into the sinus. According to Dr. Jafek, none of the actions taken by Dr. Burgess that may have caused, or in fact did cause, the resulting penetration of the brain fell below the requisite standard of care for an otolaryngologist performing a bilateral intranasal ethmoidectomy via the technique utilized in the case *sub judice.*

Dr. Burgess testified on his own behalf concerning what happened during Mr. Kennelly's operation. Dr. Burgess stated that, after the patient was anesthetized, he entered the nasal cavity and moved, rather than removed, the middle turbinate. Dr. Burgess explained that he did not remove the middle turbinate because he had not been taught to perform the procedure in that manner. On the contrary, he stated that, in his experience, "the majority of people [surgeons] do not remove the middle turbinate," because they use it as a surgical landmark.

Dr. Burgess then testified that he proceeded to remove the inflamed mucosa and septated bony partitions with the Blakeslee forceps. He further stated that based on Mr. Kennelly's preoperative CAT scans and physical examination, he knew that the disease existed up to the roof of the ethmoid sinus. Like the other three otolaryngologists who testified, Dr. Burgess explained that when using a head-mounted light and the Blakeslee forceps, rather than an endoscope, the procedure is partially dependent on the doctor's sense of touch. According to Dr. Burgess, he did not feel or observe anything out of the ordinary when performing Mr. Kennelly's intranasal ethmoidectomy.

Dr. Burgess also explained that during a normal bilateral ethmoidectomy, a patient would lose approximately 400 to 500 cc's of blood on **each side.** Therefore, the customary blood loss, according to Dr. Burgess, would be between 800–1,000 cc's. He testified that he considered, in retrospect, that the 1,000 to 1,200 cc's of blood lost by Mr. Kennelly was "unusual", but only to the extent that "it was a little more" bleeding than he anticipated. Dr. Burgess also disputed a reference in Dr. Tolner's report that when he referred Mr. Kennelly to Dr. Tolner for observation, he told Dr. Tolner that he "aggressively packed" the nasal cavity to halt "copious" bleeding.

Dr. Burgess also stated his opinion concerning what happened during Mr. Kennelly's surgery:

> My opinion is that probably because of all the chronic inflammation in the area, that the chronic inflammation causes a thinning of the bone and . . . and this bone which is ordinarily, you know, egg-shell thin, was thinned even further and . . . and when you grab the mucosa with the Blakeslee forceps, it's possible to . . . as you grasp the mucosa and pull the mucosa out, it's possible that this very . . . very, very thin bone will come with it. Another possibility is that this bone is so soft and . . . and spongy in consistency that when you relied on your sense of feel to . . . to feel the rigidity of the bone to let you know that there's the ethmoid roof there, you . . . you don't encounter any resistance so it doesn't give you notification of that. So you can remove a portion of it and it doesn't have any different feel than . . . than the mucosa of the sinus disease. And indeed, when you remove the Blakeslee forceps, you see the diseased sinus .mucosa, so you know you're in . . . you're doing the procedure as you indicated.

On cross-examination, among other disputes, appellants' counsel challenged Dr. Burgess's contentions that Mr. Kennelly's ethmoid bone, or fovea ethmoidalis, was "very thin" or spongy due to inflammation. Appellants' counsel questioned him concerning the pathology report prepared by Dr. Rodriguez that had been admitted into evidence, as well as the testimony of Dr. Rodriguez. Specifically, appellants' counsel

questioned appellee concerning Dr. Rodriguez's testimony that the bone specimens he examined were "free of any type of inflammatory process." [3] Burgess, however, stated that he did not recall making such a statement. Appellants' counsel abandoned that line of questioning.

Following the testimony of Dr. Burgess, the trial court provided instructions to the jury, including, but not limited to the following ones, which are germane to this appeal:

A witness who has special training or experience in a given field is permitted to express opinions based on observed or assumed facts to aid you in deciding the issues in the case. In weighing the opinions of an expert, you should consider the expert's experience, training and skills, and the expert's knowledge of the subject matter about which he's expressing an opinion....

General rules of negligence apply to malpractice cases as well as to ordinary claims of negligence ... You are instructed that the standard of care which a physician is required to adhere to in the practice of his profession is only that ... that of a reasonably competent physician under the same or similar circumstances, that is to say the physician is not required by law to exercise any care and skill of a special character which exceeds that ordinarily and customarily employed by a physician in his field. *An unsuccessful result following medical treatment is not evidence of negligence.* Kevin and Lynette Kennelly carry the burden to prove negligence.

---

3. The existence of inflammatory process in the area of the fovea ethmoidalis constituted an important component of appellees' case. While the testifying pathologist, Dr. Rodriguez, maintained that the bones he examined appeared free of any inflammation, he could not define their point of origin. Dr. Jafek, although not an expert in pathology, was permitted by the court to examine the pathology slides and express his opinion that the bony fragments were inflamed, but that it was not evident at the magnification presented. Despite appellants' trial objection to this portion of Dr. Jafek's testimony, they did not argue it as an issue on appeal. We decline to consider this issue in detail because such an evaluation of contradictory medical testimony would invade the province of the jury as the finder of fact.

Therefore, if you should find . . ., if . . . should you find that Dr. Burgess used ordinary and reasonable care with respect to the care and treatment of Kevin Kennelly and did not depart from the accepted standards and practices in connection with that care and treatment, then you must return a verdict in favor of Dr. Burgess.

In considering the question of whether the alleged medical malpractice negligence of the Defendant was the cause of the injuries of which the Plaintiff now complains, you must form your judgment only on the basis of expert medical testimony which speaks in terms of reasonable probability or reasonable certainty. In a medical malpractice case, medical facts are for medical experts. However, your verdict may not be based on expert testimony which admits a mere possibility of negligence, or a mere possibility that such negligence caused the injuries complained of.

(emphasis added).

Appellants' counsel objected to the court's presentation of one instruction and the court's failure to give another:

COURT: All right. Any exceptions or additions by the Plaintiff?

COUNSEL: Yes, your Honor, the . . . the Plaintiffs object to instruction . . . That particular instruction says that an unfair result merely . . .

COURT: Okay.

COUNSEL: [A] result on a medical incident . . .

COURT: Okay.

COUNSEL: [C]annot be . . . you can't infer any negligence from that, and I also, Your Honor, object for the Court's failure to give a proposed instruction . . . which specifically said an expert witness, because he is an expert, can infer negligence from the result of the medical practice, and I was relying on *Meda versus Brown.*

COURT: Right. Anything else?

COUNSEL: No, your Honor.

The trial court overruled appellants' objections and after closing arguments by both sides, submitted the case to the jury for its consideration. The jury returned a verdict in favor of Dr. Burgess and Scott E. Burgess, P.A. On 6 October 1992, the Kennellys noted a timely appeal to this court.

## DISCUSSION

### I.

In reviewing the jury instructions given by a trial judge, we must look at the complete charge as a whole, and not selectively examine individual statements, which, out of context, may appear misleading or improper. *Mayor & City Council of Baltimore v. Kelso Corp.*, 46 Md.App. 285, 294, 416 A.2d 1339 (1980). Moreover, a charge to the jury will not be condemned because an isolated part seems to be unjust to one side or because of the way in which it is expressed. *Kauffman v. Love*, 252 Md. 251, 253–54, 249 A.2d 700 (1969).

In *Lane v. Calvert*, 215 Md. 457, 138 A.2d 902 (1957), the Court of Appeals stated in the context of a medical malpractice case that "[i]t is well established by the case law in this State that the mere fact that an unsuccessful result follows medical treatment is not of itself evidence of negligence." [4] *Lane*, 215 Md. at 462–63, 138 A.2d 902. Appellants vigorously dispute the jury instruction provided by the trial court that contained the same language. According to appellants, this instruction constituted reversible error because the Kennellys' otolaryngology expert, Dr. Stankiewicz, relied, in part, on the obvious "unsuccessful results" of Mr. Kennelly's surgery to arrive at his opinion that Dr. Burgess's conduct deviated from the appropriate standard of care.

---

**4.** In *Lane*, the plaintiff failed to ask its medical expert key standard of care questions and apparently attempted to rely on the mere bad result as sufficient evidence of negligence to remedy the inadequacy of expert proof.

The Kennellys argue that the testimony of Dr. Stankiewicz created an inference of negligence that made the "unsuccessful result" instruction inappropriate. According to appellants, "[t]he giving of the instruction in the case at bar that an unsuccessful result following medical treatment is not evidence of negligence directly and negatively affect[ed] the inference of negligence" because "the unsuccessful result plays heavily in cause and effect."

Appellants rely primarily on the reasoning employed by the Court of Appeals in *Meda v. Brown,* 318 Md. 418, 569 A.2d 202 (1990), to support their position. In *Meda,* a patient suffered unexplained nerve damage in her arm after undergoing a bilateral breast biopsy and, as a result, sued her anesthesiologist.[5] At trial, the plaintiff's two medical experts "could not identify with particularity the specific act of negligence and precise mechanism of injury." *Meda,* 318 Md. at 427, 569 A.2d 202. There was no indication that the plaintiff's medical experts relied on anything but the injury following the operation and the well-known susceptibility of the ulnar nerve to compression injury during surgery to infer that the anesthesiologist was negligent. Both experts testified, however, that it was their opinion within a reasonable medical probability that the plaintiff's injury occurred in the operating room, and whatever the precise cause, the resulting injury established a deviation from the standard of care. *Id.* There was no indication that the defendant provided any contrary expert medical testimony.

Following the parties' presentation of evidence, no instruction on *res ipsa loquitur* or the required criteria for the application of that concept was given. A jury awarded the plaintiff $600,000.00, but the trial court entered a judgment

---

5. In *Meda,* the plaintiff sued the anesthesiologist in the Circuit Court for Baltimore City after the anesthesiologist rejected the Health Claims Arbitration Panel's decision in favor of the plaintiff. According to the facts, the plaintiff sued the anesthesiologist for his failure to position the plaintiff's arm properly prior to surgery so as to avoid susceptibility to compression of the ulnar nerve which runs from the shoulder to the hand. *Meda,* 318 Md. at 426, 569 A.2d 202.

notwithstanding the verdict, concluding that "dependence upon an inference necessarily means that the concept of *res ipsa loquitur* is invoked." *Id.* at 422, 569 A.2d 202.

The Court of Appeals, on certiorari from our reversal of the trial judge's decision,[6] considered the following issues: 1) whether the concept of *res ipsa loquitur* had been invoked properly; and 2) whether the trial court properly admitted the testimony of plaintiff's medical experts despite their inability to identify with particularity the specific act of negligence and precise mechanism of injury. *Meda*, 318 Md. at 418, 569 A.2d 202.

Following a lengthy explanation of the concept of *res ipsa loquitur*, the court held that the doctrine did not apply.[7] The court distinguished between the appropriate application of *res ipsa loquitur* and the medical malpractice case then before it when it stated the following:

> [t]he closest that this case comes to reliance upon *res ipsa loquitur* is in the inferential reasoning process used by the plaintiff's experts in arriving at their conclusions that Dr. Meda was negligent. As we shall see, neither ... [of the plaintiff's experts] could testify as to the precise act of negligence that caused injury to Mrs. Brown's ulnar nerve. Each doctor, based upon his knowledge of the facts and

---

**6.** This court addressed the issue presented based on the relevant facts and held the following:

> We think the general knowledge and experience of ordinary jurors, particularly when supported by expert medical testimony that such injuries are not risks ordinarily inherent to the surgical procedure in question, is such that the jurors may infer negligence from an unusual injury to a healthy part of the patient's body remote from the area of the operation.

*Brown v. Meda*, 74 Md.App. 331, 345, 537 A.2d 635 (1988).

> Thus, we essentially placed the plaintiff's injury into the category of "obvious injury" in order to apply *res ipsa loquitur*.

**7.** The court refused to classify the circumstances as an "obvious injury" case alleviating the need for medical expert testimony. In this regard, the court stated, "If this plaintiff had offered no expert testimony, but had simply shown the onset of an ulnar nerve injury ..., the jury would not have been permitted to infer negligence from the facts alone." *Meda*, 318 Md. at 428, 569 A.2d 202.

upon his expertise, concluded that Mrs. Brown's injury was one that ordinarily would not have occurred in the absence of negligence on the part of the anesthesiologist. *This inferential reasoning process has a familiar ring to it. It is a major part of the concept of res ipsa loquitur. It is not, however, res ipsa loquitur.* (emphasis added).

*Meda,* 318 Md. at 425, 569 A.2d 202.

In *Meda,* the court specifically distinguished between the inferences properly drawn by the jury and those drawn by medical experts in the context of a medical malpractice case. While the court stated that the medical experts may employ inferential reasoning based, in part, on circumstantial evidence to arrive at their conclusions, it did not decide whether such reasoning gave rise to an overall inference of negligence similar to *res ipsa loquitur.* Rather, the court confined its holding to the admissibility of such medical expert testimony.

In *Meda,* neither of the plaintiff's experts could testify to a reasonable medical probability concerning the precise manner of the anesthesiologist's negligence. Their testimony was limited to the conclusion that the damage to plaintiff's "ulnar nerve occurred in the operating room . . . as a result of one of these causes [8], and that to permit that to happen was not in keeping with the standard of care required of the anesthesiologist." *Meda,* 318 Md. at 427, 569 A.2d 202.

The defendants in *Meda* argued that the trial judge erred in permitting the plaintiff's experts to testify because their opinions were based on a combination of direct and circumstantial evidence that failed to prove the specific act of negligence beyond mere speculation or conjecture. *Id.* The Court of Appeals disagreed, however, and held the testimony admissible because the circumstantial evidence upon which the plaintiff's experts relied "had support in the record," and "the reasoning they employed was based upon logic rather than

---

8. In particular, one of the plaintiff's experts in *Meda* offered numerous possibilities for the precise cause of the injury, but based on the available evidence, could not state to a reasonable medical probability what happened.

speculation or conjecture." Thus, the Court affirmed the Court of Special Appeals' decision, "not on the basis of the applicability of *res ipsa loquitur*, but because the testimony was sufficient to support the inferential conclusions of negligence drawn by the plaintiff's expert." *Meda*, 318 Md. at 420, 569 A.2d 202.

Appellants contend that the holding in *Meda* is dispositive. The case *sub judice*, however, is both factually and problematically distinguishable from *Meda*.[9] In contrast to the medical experts in *Meda*, Dr. Stankiewicz described a specific act of negligence when he stated, "My opinion is that at the time of surgery on Kevin Kennelly, that Dr. Burgess went through the fovea ethmoidalis, cribriform plate area and entered into the brain, and this is not within the standard of care for that surgery." His explanation of the methods employed by Dr. Burgess described in detail how he believed Dr. Burgess performed the ethmoidectomy which lead to Mr. Kennelly's injuries.

Moreover, unlike the medical experts who testified in *Meda*, Dr. Stankiewicz's opinion was based on several sources of medical data, including: the results of CAT scans, the operative report from the ethmoidectomy, and the reports provided by the treating or examining physicians. In fact, prior to the recitation of his opinion to the jury, appellants' counsel led Dr. Stankiewicz through an extensive review of specific medical records. In particular, he relied on the examinations of CAT scans affirming the existence of defects in the fovea ethmoidalis, as found by Dr. Nauta when he operated to repair what damage he could, to conclude that the defects were cause by "intraoperative injury." These were the same holes at the floor of the skull that Dr. Nauta earlier had described as "nibbled" or "scalloped" as by an operative instrument.

---

**9.** We note an inconsistency in the argument advanced by appellants. While they alleged in their brief that the "unsuccessful result" instruction should not have been given, they also argued in their reply brief that "Dr. Stankiewicz *did not* infer negligence from the result."

Due to a complete lack of medical indicators as to how the plaintiff's injury occurred, the medical experts who testified in *Meda* had to rely solely on their knowledge of the general susceptibility of the ulnar nerve to compression injury and the general time frame of the injury's occurrence to infer that the injury occurred in the operating room. In contrast, the reasoning process employed by Dr. Stankiewicz that led to his conclusion was marshalled from an array of concrete medical facts. It was unnecessary for him to rely solely on Mr. Kennelly's concluding injuries and resultant mental impairments following the ethmoidectomy in order to opine Dr. Burgess committed malpractice. Indeed, the trial transcripts demonstrate that he did not. But for Dr. Burgess's operative notes, and the tests and examinations following the performance of the ethmoidectomy, it would have been impossible for Dr. Stankiewicz to describe, as he did, the specific act of negligence by Dr. Burgess.

Thus, the information provided in the medical reports pertaining to the pathology specimens, the existence of chiseled defects in the fovea ethmoidalis, and the bleeding and white blood cell count following surgery, as well as Dr. Burgess's practice of leaving the middle turbinate intact during the performance of the ethmoidectomy, provided Dr. Stankiewicz with the evidence to conclude as he did. From the results of those tests and examinations, and not the mere result of the ethmoidectomy itself, Dr. Stankiewicz concluded that Dr. Burgess was negligent.

Appellants also rely on the companion case to *Meda*, *Orkin v. Holy Cross Hospital*, 318 Md. 429, 431, 569 A.2d 207 (1990), to support their position that an inference of negligence was created by Dr. Stankiewicz's testimony. *Orkin* also involved a plaintiff whose ulnar nerve was injured when she entered the hospital for repair of a perforated ulcer. The plaintiff in *Orkin*, like the plaintiff in *Meda*, could not ascribe a particular negligent act to any defendant. Consequently, the defendants anesthesiologist and hospital moved for summary judgment, which the trial court granted.

The Court of Appeals vacated the judgment and remanded the case, stating that the plaintiff's intention to present medical expert testimony would enable her to establish a prima facie case of negligence possibly sufficient to take the case to the jury. *Orkin,* 318 Md. at 433–34, 569 A.2d 207. The Court specifically stated that *res ipsa loquitur* did not apply. *Id.* at 433, 569 A.2d 207. Nevertheless, it further refined the distinction in scope between the two types of inferences addressed in *Meda* when it stated:

As was the case in *Meda v. Brown, supra,* it is important to distinguish between: 1) the inference of negligence that may properly be drawn by an expert, but could not properly be drawn by a lay juror, and 2) the inference of negligence that may properly be drawn by a lay juror from the facts, unaided by expert testimony. *Of the first, it might be said that "the thing speaks for itself," at least in terms of what the facts say to the expert. But that may be said of inferences in general, and yet it is not res ipsa loquitur as we know that concept in the law of negligence.* In the strictest sense, *res ipsa loquitur* is limited to those instances where, certain criteria having been met, the trier of fact may draw an inference of negligence from the facts alone.

*Orkin,* 318 Md. at 431, 569 A.2d 207 (emphasis added).

In the case *sub judice,* it can hardly be said that "the thing speaks for itself" in terms of what the facts indicated to the experts. To the contrary, Drs. Mattox and Jafek adamantly disagreed with Dr. Stankiewicz concerning significance of the known facts with respect to Dr. Burgess's alleged deviation from the applicable standard of care. Drs. Mattox and Jafek concluded to a reasonable medical probability that Dr. Burgess never penetrated the cavity of the brain resting in its normal position. Therefore, according to Drs. Mattox and Jafek, the conduct of Dr. Burgess did not fall below the requisite standard of care for the procedure involved. In contrast, Dr. Stankiewicz, relying on the same pool of medical data available to Drs. Mattox and Jafek, concluded to a reasonable medical probability that Dr. Burgess, in fact, had penetrated the brain while it was resting in its normal position

in the skull, thereby committing medical malpractice. The existence of contradictory testimony between medical experts, therefore, eliminated any direct application of either *Meda* or *Orkin.*

We decline to extend the holdings in *Meda* and *Orkin* to encompass the position advanced by appellants. The obvious factual differences between the aforementioned precedent and the case *sub judice* obviate any need to elaborate further on the inferential reasoning process employed by medical experts and its relationship, if any, to the creation of an inference of negligence similar to *res ipsa loquitur.*

This apparent confusion in conceptualizing when an inference of negligence properly arises also manifests itself in appellants' reliance on precedent addressing the appropriate application of the "mere happening" instruction. We have held the "unsuccessful result" instruction analogous to the instruction frequently given in negligence cases that "the mere happening of the accident or event complained of does not create any presumption of negligence." *Hitch v. Hall,* 42 Md.App. 260, 268, 399 A.2d 953 (1979) (stating "[w]e see no substantial difference between this statement ["unsuccessful result"] and the instructions given by the trial judge ["mere happening"].").

Recently, the Court of Appeals considered whether it is reversible error to instruct the jury that the mere happening of an accident creates no presumption of negligence on the part of the defendant where the manner in which the accident happened does indeed create a rebuttable presumption of negligence. *Ristaino v. Flannery,* 317 Md. 452, 454, 564 A.2d 790 (1989). In *Ristaino,* plaintiff passengers in a car heading eastbound sued a westbound driver to recover for injuries sustained when the westbound driver crossed the center line and struck the vehicle containing the plaintiffs. *Id.* at 454–55, 564 A.2d 790.

> During its instructions, the trial court charged the jury: "the mere happening of an accident complained of creates no presumption of negligence on the part of the [d]efen-

dant," that "skidding of and in itself is not alone by itself evidence of negligence," and that "[a] driver who violates the rule of the road ... is prima facie guilty of negligence where the violation directly and proximately causes a collision."

*Ristaino,* 317 Md. at 455, 564 A.2d 790.

The plaintiffs objected to the mere happening instruction. They argued that the crossing of the center line by defendant's vehicle amounted to prima facie evidence of negligence sufficient to shift the "burden of going forward ... to the [d]efendant." *Id.*

The Court contemplated three possible scenarios in which a plaintiff presents evidence of a primary fact and, from that fact, seeks to take advantage of an inference of negligence: 1) if the negligence is not contested by the defendant, the "mere happening" instruction is inappropriate; 2) if the primary fact is in dispute, then the "mere happening" instruction is appropriate "so long as it is made clear that it is the mere happening of the accident as described in the evidence most favorable to the defendant that does not give rise to a presumption of negligence;" or 3) if the primary fact is uncontradicted but the defendant sufficiently controverts the inference of negligence, the giving of a bare "mere happening" instruction is inappropriate. *Ristaino,* 317 Md. at 460–61, 564 A.2d 790.

The *Ristaino* Court placed the factual situation before it in the third scenario. Although the primary fact, *i.e.,* the defendant's violation of the motor vehicle law by crossing the center line, was uncontradicted, the defendant sufficiently controverted the inference of negligence to generate a jury issue. *Ristaino,* 317 Md. at 461, 564 A.2d 790. The instruction at issue was inappropriate, therefore, because the plaintiff had properly invoked the inference of negligence.

Appellants contend that the factual scenario related to Mr. Kennelly's surgery also warrants placing the case *sub judice* in the third scenario. In particular, they argue that they presented evidence of a primary fact, *i.e.,* Mr. Kennelly's

operation performed by Dr. Burgess resulted in holes in the fovea ethmoidalis and extraction of brain matter, which is uncontradicted and uncontroverted. According to appellants, this fact alone, considered by Dr. Stankiewicz, supported an inference or presumption of negligence.

Appellants misinterpret the proper characterization of the primary fact in *Ristaino* which, in turn, causes them to miscategorize their factual scenario as falling under the third subset. In *Ristaino*, the primary fact was crossing the center line and driving on the wrong side of the road. That, of itself, suggests negligence. As stated by the *Ristaino* court, it is a definitively accepted principle that such a violation of a rule of the road creates an inference of negligence. *Ristaino*, 317 Md. at 457–58, 564 A.2d 790.

In the case *sub judice*, the existence of holes in the fovea ethmoidalis and the extraction of brain matter did not, of themselves, suggest negligence. Any inference would depend on what caused those holes and the extraction, and the evidence as to that was in dispute. The primary facts at issue were what actions taken by Dr. Burgess and what pre-existing condition of Mr. Kennelly's fovea ethmoidalis, if any, **caused** Mr. Kennelly's injury. Specifically in dispute were the extent of Dr. Burgess's penetration and the position of the brain during the procedure. If the brain was in its normal position and he penetrated it, all standard of care experts agreed that Dr. Burgess committed medical malpractice. If, however, the brain herniated into the ethmoid sinus area following an initial removal of the diseased mucuosa and fovea ethmoidalis, Drs. Mattox and Jafek agreed that this would not constitute a deviation from the standard of care. In this regard, Dr. Stankiewicz stated as well that "it would be a grey area" depending on "what the outcome is with the patient." Dr. Stankiewicz also conceded that, when the "classical" versus the endoscopic technique is employed, it is possible for a competent surgeon to be unable to detect any indicia that the fovea ethmoidalis had been removed, thus putting the surgeon on notice of the potential for complications.

The factual dispute between the parties concerning the manner of injury creates a situation inconsistent with the scenario determined by the Court to have been presented by the facts in *Ristaino.* In contrast to *Ristaino,* no overriding principle in medical malpractice cases exists which pronounces that if an individual undergoes sinus surgery and receives brain damage, an inference of negligence necessarily arises. In fact, the *Lane* Court stated to the contrary when it noted, "There is a presumption that the doctor has performed his medical duties with the requisite skill and care." *Lane,* 215 Md. at 462, 138 A.2d 902.

The facts of the case *sub judice* are better suited to the second scenario contemplated in *Ristaino,* which applies in cases where "the primary facts are in dispute and, consequently, the availability of an inference or presumption of negligence is also in dispute." *Ristaino,* 317 Md. at 460–61, 564 A.2d 790. The *Ristaino* Court recognized that the "mere happening" instruction is normally appropriate under circumstances that entail the second scenario, "so long as it is made clear that it is the mere happening of the accident as described in the evidence most favorable to the defendant that does not give rise to the presumption of negligence." *Id.* at 461, 564 A.2d 790. In support of this position, the Court cited *Kelly v. Huber Baking Co.,* 145 Md. 321, 125 A. 782 (1924), in which it reviewed a "mere happening" instruction given in a case where a factual conflict existed over which vehicle crossed the center line. *Id.* The defendant's requested "mere happening" instruction granted in *Kelly* read as follows:

The Court instructs the jury that the mere happening of the accident complained of raises no presumption of negligence on the part of a servant of the defendant operating the automobile referred to in the evidence, but the burden is upon the plaintiff to establish by a preponderance of affirmative evidence that negligence on the part of said servant caused said accident, and if the minds of the jury are left by the evidence in a state of even balance as to the existence of such negligence, then the verdict of the jury must be for the defendant.

*Ristaino,* 317 Md. at 461, n. 2, 564 A.2d 790 *quoting* Record of *Kelly,* at 4–5.

The trial court's instructions to the jury concerning the results of Mr. Kennelly's surgery and appellants' burden of proof were comparable to those given in *Kelly.* The relevant charge provided by Judge Lerner in the instant case was no less specific than that approved by the Court of Appeals in *Kelly* as an instruction that " 'state[d] general principles of law applicable to the facts of the case in a form which has been repeatedly approved by this Court, and [was] properly granted.' " *Ristaino,* 317 Md. at 461, 564 A.2d 790, *quoting Kelly,* 145 Md. at 329, 125 A. 782.

The total charge given by the trial court sufficiently alerted the jury that it was permitted to consider all of Dr. Stankiewicz's testimony. The "unsuccessful result" instruction prohibited the jury solely from equating brain damage with negligence. The instructions correctly also advised the jury that the medical facts presented, both "observed" and "assumed", were for medical experts, including Dr. Stankiewicz, to interpret. Dr. Stankiewicz relied on recorded facts observed by treating and examining physicians and assumed facts, based on a combination of the observed facts and his medical background and experience, to conclude Dr. Burgess had been negligent.

We are not willing, as appellants apparently desire, to wed the inferential explanations provided in *Meda* and *Orkin* with those espoused in *Ristaino* and, as a consequence, find error in the "unsuccessful result" instruction given by the trial court. Therefore, in sum, we note that the evidence adduced at trial was generally no different than that presented in typical medical malpractice cases, meaning that both parties produced medical experts to testify to a reasonable medical probability in their favor. The medical experts who testified at trial, including Dr. Stankiewicz, relied on detailed medical data to arrive at their respective opinions concerning the precise mechanism of Mr. Kennelly's injury. These factors distinguish the case *sub judice* from the factual situations

existing in *Meda* and *Orkin* in which no detailed contradictory expert testimony was presented. Moreover, the conflicts in opinion as to causation between the experts eliminated the creation of any inference of negligence similar to that which resulted in the holding of the Court in *Ristaino*.

According to appellants, the "unsuccessful result" instruction given by the judge told the jury that Dr. Stankiewicz's testimony was meaningless. Based on the foregoing review of the relevant precedent, the evidence presented at trial, and the totality of instructions given by the trial court, we disagree. Consequently, we hold that the trial court's "unsuccessful result" instruction did not prejudice the jury's consideration of Dr. Stankiewicz's medical conclusion so as to constitute reversible error.

## II.

Appellants also argue that if the trial court instructed the jury that unsuccessful results following medical treatment were not evidence of negligence, but there exists expert testimony that was based on those unsuccessful results, then the trial court was required to instruct the jury that "an expert can infer negligence from the result of the medical practice."

A party is generally entitled to have its theory of the case presented to the jury if: "(1) the instruction . . . correctly state[s] the law, and (2) that law [is] applicable in light of the evidence before the jury." *Sargeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651 (1979); *Edmonds v. Murphy*, 83 Md.App. 133, 176, 573 A.2d 853 (1990), *cert. granted*, 321 Md. 46, 580 A.2d 1066, *aff'd*, 325 Md. 342, 601 A.2d 102 (1991). This precedent notwithstanding, there is no obligation on the part of the trial judge to give a particular instruction if the instructions actually given fairly cover the issues raised in the proffered instruction. *Mitchell v. Montgomery County*, 88 Md.App. 542, 562, 596 A.2d 93 (1991).

In the instant case, the Kennellys argue that the trial court's failure to give the requested instruction left the jurors

"in a vacuum," because "they were not told the legal effect of Dr. Stankiewicz's testimony." They accurately state that the requested instruction is a correct statement of the law in Maryland. Indeed, the Court of Appeals in *Meda* held that medical experts may establish negligence "by proof of circumstances from which its existence may be inferred." *Meda,* 318 Md. at 427–28, 564 A.2d 790. Where appellants' claim fails, however, is the applicability of the proposition contained in *Meda* to the case *sub judice* based on the evidence adduced at trial.

In the previous section, we explained that the record does not reflect that appellants' standard of care expert, Dr. Stankiewicz, relied on the outcome of Mr. Kennelly's ethmoidectomy to reach his opinion. Thus, while the requested instruction may have been a correct statement of the law, it was not applicable in light of the evidence before the jury.

Moreover, the Kennellys contend that Dr. Stankiewicz did not infer his opinion from the fact of brain damage alone; instead, he inferred his opinion from a combination of individual "negligent acts" or "bad results." According to appellants, these "individual" bad results included: penetrating the roof of the ethmoid and the dura, causing a cerebral spinal fluid leak, severing an artery, and extracting brain tissues.

These "individual unsuccessful results" were not results at all. Rather, they constituted elements of the medical treatment itself. The *only* undisputed unsuccessful results following the medical treatment provided by Dr. Burgess were the CSF leak and organic brain damage, and we shall not permit appellants to enlarge the scope of those results to include actions possibly taken by Dr. Burgess during the surgery. Despite appellants' contentions to the contrary, the specific acts of negligence described in the opinion of its standard of care expert do not constitute "unsuccessful results" of surgery.[10]

---

10. Like their argument based on *Ristaino,* again appellants confuse the proper cause and effect of the surgical procedure. Essentially, appel-

Thus, because Dr. Stankiewicz relied on medical data to arrive at his conclusion, the trial court was not required to give the jury the instruction requested by appellants' counsel. Consequently, we hold that the trial court's charge to the jury did not prejudice the Kennellys.

As we noted at the outset, because of our disposition of appellants' first two issues addressed to liability, we need not, and do not, reach their third issue which dealt solely with an alleged evidentiary failing in the damages aspect of the trial.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.

lants have argued that the causes, *i.e.*, the alleged failure by Dr. Burgess to follow landmarks and refrain from penetrating the fovea ethmoidalis, dura, and the brain, are also the effects, or "unsuccessful results" of surgery. This reasoning is clearly circular, and therefore, incorrect.