LANE *v.* CALVERT ET AL.

[No. 93, September Term, 1957.]

458

*Decided February 24, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Patricia Warren,* with whom was *Albert Brick* on the brief, for appellant.

*Joseph B. Simpson, Jr.,* with whom were *Vivian V. Simpson* and *Simpson & Simpson* on the brief, for *Read N. Calvert,* appellee.

*John M. McInerney* for Washington Sanitarium & Hospital, Inc., appellee.

BRUNE, C. J., delivered the opinion of the Court.

The plaintiff, Henry F. Lane, brought this suit, both as ancillary administrator of his deceased wife, and individually, in the Circuit Court for Montgomery County against Dr. Read N. Calvert and Washington Sanitarium & Hospital, Inc., for alleged negligence in the performance of an operation on the plaintiff's wife and for alleged negligence in post-operative care of the patient. The case was tried before the court and a jury and resulted in verdicts being directed for each of the defendants and judgments being entered accordingly, from which the plaintiff appealed. The appeal from the judgment in favor of the hospital was abandoned during the argument in this Court.

There were two different claims of negligence in the trial court. The first related to the original operation. It has not been pressed in this Court, and we agree with the trial judge that there was no evidence to sustain a charge of negligence based upon the original operation. The second charge of negligence is based upon an alleged lack of proper post-operative care.

The plaintiff's wife was suffering from carcinoma, or cancer, when she first consulted Dr. Calvert in late April or early May of 1953. It now appears that it had then progressed to such a stage as to have been incurable, and she died of it in March, 1954. Though the declaration contained a claim for wrongful death, this claim seems quite unsupported and is not urged at all in this Court. The claims with which this suit is now concerned are for pain and suffering of the decedent, for the prolongation of her hospitalization and for increased expense incident thereto.

It is necessary to a consideration of the charge of negligence in post-operative treatment to state briefly the nature of the original operation, the difficulties which followed it and what was done to meet them. When Mrs. Lane was referred by her own physician to Dr. Calvert, as a surgeon, she was suffering from carcinoma of the descending colon, which had reached an advanced stage. He correctly diagnosed her illness and his diagnosis was fully confirmed. When he performed his initial operation on May 5th, 1953,

he found a large cancer in the upper part of the left colon, which had gone through all three coats of the bowel and had become attached to the back. He found no signs of cancer in the liver or glands and thought that the complete removal of the tumorous mass and of portions of the colon on either side of it gave the best chance of preventing the spread of cancer and for the survival of the patient. The cancer had progressed to the stage of being almost inoperable. Dr. Calvert proceeded to perform the operation, in spite of the difficulty. He removed a large portion of the colon, together with the large tumor, all in one piece, and then joined together the two remaining sections of the bowel.

The voluminous hospital records and the testimony in the case show that Mrs. Lane ran a fever intermittently for some six weeks after the initial operation, for which a variety of treatments were used, including antibiotic drugs, blood transfusions and surgical drainage operations. She was also x-rayed some four or five times. Dr. Calvert consulted several other doctors, among them the patient's regular physician, the Chief of Surgery of the hospital's visiting staff, and Dr. V. M. Iovine, an experienced surgeon in Washington who was associated with a number of hospitals in that city and was a member of the medical faculty of George Washington University. He was called in as a consultant at the request of Mr. Lane and with the consent of Dr. Calvert.

Dr. Calvert performed three operations for drainage purposes after the initial major operation. The first was on May 25th. At that time he located and drained an abscess and removed a considerable amount of pus. He testified that there was a fecal fistula, that presumably the pus pockets came from it and that presumably matter in the pus pockets was coming through the suture line made at the time of the original operation. The second drainage operation was performed on June 11th. On that occasion he failed to locate and drain any pus. It was after this operation that Dr. Iovine was called in at Mr. Lane's request, and he first saw the patient on June 24th, went over her hospital record and consulted with Dr. Calvert.

Dr. Iovine suspected what Dr. Calvert had previously suspected and had attempted to correct. It was Dr. Iovine's opinion "that there was still a collection of pus somewhere in the abdominal cavity that required drainage." He suggested two types of x-rays—one, chest x-rays to determine the level of the diaphragm; the other, "the installation of a dye in this opening to determine whether there was a tract that led to a pocket." The two surgeons discussed the advisability of performing a colostomy, but Dr. Iovine thought that the first thing requiring attention was the drainage of pus. This was apparently also Dr. Calvert's opinion. Dr. Iovine explained that if the collection of pus were taken care of and the area drained, the patient would be more comfortable and the immediate threat to her existence would be removed. He pointed out that there was evidence of another "difficulty and that was a fistula, a connection between the bowel and this abscessed cavity." He went on to say: "Occasionally, when a collection of pus is drained adequately, these fistulas, if there is no obstruction to the bowel content, will close of their own accord. If they do not, you can assist the healing process by short-circuiting the area—performing a colostomy." Matters seem to have worked out in this way, and no colostomy was found necessary for Mrs. Lane.

Dr. Iovine's suggestion of injecting a lipiodol dye in the fistulous area was adopted. This caused the tract where pus had accumulated to show up clearly on x-ray pictures. Dr. Calvert then performed the third drainage operation. It proved effective in locating and removing pus then accumulated, the pocket continued to drain through drains which Dr. Calvert then inserted and eventually the fistula closed itself. At a later stage, some time after Mrs. Lane had left the hospital (before the time when Dr. Calvert would have approved her doing so) and had returned to her home, Dr. Iovine reinserted the drains which Dr. Calvert had inserted and which had come loose. Such a loosening appears to be a not uncommon occurrence and no charge of negligence is based thereon.

The gravamen of the plaintiff's charge of negligence in the defendant's post-operative treatment of the patient is that

the defendant delayed unduly the use of the dye technique to locate and drain the pus accumulations. Dr. Calvert had used x-rays and he had made incisions for drainage purposes before Dr. Iovine was called in and before the lipiodol dye was used. Dr. Calvert's testimony is that he located the focal point of the pus accumulations each time that he performed a drainage operation, but the second such operation failed to result in the immediate removal of any pus. The dye technique, as shown by Dr. Iovine's testimony, had been in medical use for over twenty years, though the particular dye here used, lipiodol, seems to have been of more recent origin. When Dr. Calvert employed the dye technique, it showed the location of the pus pocket and apparently enabled him to clear up the situation. The chief question is whether or not his failure to use this technique sooner was evidence of negligence on his part in the post-operative treatment of the patient.

The rules of law applicable in this State to cases of alleged medical malpractice, such as the present, are well established. There is a presumption that the doctor has performed his medical duties with the requisite care and skill. *State, Use of Janney v. Housekeeper,* 70 Md. 162, 16 A. 382; *Fink v. Steele,* 166 Md. 354, 171 A. 49; *McClees v. Cohen,* 158 Md. 60, 148 A. 124. The burden of proof is on the plaintiff to show both a lack of the requisite skill or care on the part of the doctor and that such want of skill or care was a direct cause of the injury; and if proof of either of these elements is wanting the case is not a proper one for submission to the jury. *State, Use of Kalives v. Baltimore Eye, Ear and Throat Hospital,* 177 Md. 517, 10 A. 2d 612; *Angulo v. Hallar,* 137 Md. 227, 233, 112 A. 179. The rule as to the degree of skill required is stated in *Dashiell v. Griffith,* 84 Md. 363, 380, 35 A. 1094: "* * * the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally." This rule has since been followed consistently in *Miller v. Leib,* 109 Md. 414, 426, 72 A. 466, and *Angulo v. Hallar, supra.*

It is well established by the case law in this State that the mere fact that an unsuccessful result follows medical treat-

ment is not of itself evidence of negligence. *Bettigole v. Diener,* 210 Md. 537, 124 A. 2d 265; *State, Use of Kalives v. Baltimore Eye, Ear and Throat Hospital, supra.* Nor does the doctrine of *res ipsa loquitur* apply. *Bettigole v. Diener, supra.*

A number of the cases above cited involve dentists. The same rules apply to them as to physicians and surgeons. *Mc-Clees v. Cohen, supra.*

The next problem is to apply these rules to the facts of this case as developed by the record. The appellant cites a number of cases from other jurisdictions in which it has been held to amount to negligence for a doctor not to use x-ray or other tests in diagnosing the cause of illness at an early stage of treatment. Some of these cases deal with failure to use x-rays to determine the existence of fractures or the presence of a foreign substance, loose fragment or other object. See *Wilson v. Corbin,* 241 Ia. 593, 41 N. W. 2d 702 (fractured back); *McBride v. Saylin,* 6 Cal. 2d 134, 56 P. 2d 941 (piece of steel in patient's eye); *Butts v. Watts* (Ky.), 290 S. W. 2d 777 (fragment of tooth); *Kosak v. Boyce,* 185 Wis. 513, 201 N. W. 757 (another case of a piece of steel in the patient's eye); *Agnew v. City of Los Angeles,* 82 Cal. App. 2d 616, 186 P. 2d 450 (fracture).

Cases closer to the instant case are *Peterson v. Hunt,* 197 Wash. 255, 84 P. 2d 999; *Corn v. French,* 71 Nev. 280, 289 P. 2d 173. In the former case the defendant erroneously diagnosed an ovarian cyst as pregnancy and failed to use a rabbit test by which the error of the diagnosis would have been disclosed much earlier. Evidence as to the number of such tests performed by a chemist in the city of Tacoma was excluded, and this was held to be erroneous. In the latter case, *Corn v. French,* failure to make a biopsy or to obtain a pathological test before performing an operation for the removal of a breast because of a supposed cancer was held sufficient evidence of negligence. Likewise in *Edwards v. West Texas Hospital* (Tex. Civ. App.), 89 S. W. 2d 801, failure to take x-rays was held sufficient to present the issue of negligence where there was testimony that the use of x-rays

would probably have shown that what the doctor supposed to be a tumor was in fact a dead fetus.

The appellant's main difficulty in this case is the lack of affirmative proof of negligence on the part of the defendant. The appellant frankly and properly concedes in his brief that his expert witness, Dr. Iovine, "did not state, in so many words, that Dr. Calvert was negligent, or that his actions did not measure up to the standard." He then asserts: "But, our witness testified as to what a surgeon *must* do in such a situation and the evidence revealed that Dr. Calvert did not do it." We have carefully examined Dr. Iovine's testimony and we do not find this assertion to be sustained by the record.

The nearest that the plaintiff came to asking when a surgeon of reasonable diligence, skill and learning should use a dye x-ray procedure was when Dr. Iovine was asked: "At what stage would you go in and take dye x-rays to determine whether there was a leakage, etc., when a patient was running a fever?" This was, of course, a question as to when the witness himself would have adopted a particular course of action and did not go to the standard of the profession. An objection to the question was sustained. There was no effort to rephrase the question so as to develop a foundation upon which negligence might be predicated, nor was there any proffer as to what the plaintiff proposed to show. See *Reid v. Humphreys,* 210 Md. 178, 187-188, 122 A. 2d 756. There is thus nothing in the record to show that the witness would have testified to the existence of a standard of professional action which the defendant should have attained under the rule of *Dashiell v. Griffith, supra,* and similar cases, but which he failed to meet. There is, we note, a marked difference between this question propounded to Dr. Iovine and others propounded by the plaintiff, which called for an expression of opinion as to what would be proper professional practice. We cannot infer that the witness would have testified to something about which he was not even questioned.

The question is also materially different from the question involved in *Hunner v. Stevenson,* 122 Md. 40, 89 A. 418, where it was held proper for an expert medical witness to testify as to how long it usually would take for a wound of

the kind described in the testimony in that case to heal. Sustaining the objection to the question as to when Dr. Iovine himself would have used the dye x-ray technique was not, in our opinion, erroneous.

The trial judge sustained an objection to a question put to Dr. Iovine as to what complications or possible causes a surgeon of ordinary diligence and care would have suspected when confronted by a case in which the patient had the symptoms which Mrs. Lane's hospital records showed following her initial operation. The ground for sustaining the objection appears to have been that the witness had already stated what he thought was the trouble. Though the sustaining of the objection on this ground may well have been erroneous, it does not appear to have been harmful to the plaintiff for two reasons. First, in substance, the ruling was reversed and the witness proceeded to testify as to what might be suspected, which seems to have been the same as what the defendant did suspect and attempted to remedy. This was, in brief, the presence of pus in the abdominal cavity (whether due to a suture line leak or to a leak of different origin) and the desirability of draining it. It did not go to the question of the means by which the surgeon should attempt to locate the pus nor, specifically, how soon he should employ any particular means of seeking to locate it. The latter were the critical questions.

Near the conclusion of his testimony as to what Mrs. Lane's symptoms would have caused him to suspect, Dr. Iovine was asked what he would have done "to track down where the fever was coming from" when it had continued for ten or fifteen days after the resection operation. He stated that if the more common probabilities were properly ruled out, "one must consider a leak at the connection line, with pus in the abdominal cavity, as being the cause for the temperature." He continued: "Examination of the patient again to find out if there is localized tenderness, or the presence of a mass; the use of x-rays to determine again, as I mentioned before, the motion of the diaphragm or its elevation to determine the presence of a collection is also important. Finally, if these signs are sufficient to indicate that there is something

wrong in that area, and that you suspect a leak, then the only thing to do is to drain the area." The appellant's trial counsel then asked, "How soon after the operation would you start that procedure?" An objection to this question was interposed but it was not directly ruled on. The trial judge inquired if the patient did not have a drain in her side when the witness saw her, and the answer was that she had already had two incisions and did have a drain at that time; and the witness then went on to testify that in his opinion the drains in place at that time were not adequate, and he had therefore suggested further drainage.

Dr. Iovine's testimony at this point does not reach the critical issue as to when a physician of reasonable skill, diligence and learning would use the dye x-ray technique. Indeed, the question propounded to him relates to the time when he would start to drain the area, not to when he would seek to locate a pus-filled cavity by any particular method. After the colloquy referred to, the witness was permitted to testify, over objection, that the situation did clear up after more adequate drainage was provided.

We think that the plaintiff has failed to meet the burden of presenting evidence which would support a finding of negligence. Though it might be inferred that if Dr. Calvert had used lipiodol dye sooner, the patient would have fared better, we do not think that the plaintiff has produced proof that the defendant was guilty of negligence in failing to use it sooner and in seeking to locate and drain the pus pockets by other means. He was clearly successful in locating a pus pocket on his first drainage incision, and that fact alone seems to prevent an inference that a dye injection was a necessary means of discovering the location of pus. Nor do we think that there is any such common knowledge of the use and efficacy of the dye method as to warrant us in holding that the jury might find, without supporting expert testimony, that the surgeon was wanting in reasonable diligence, skill and learning because he failed to use this dye test in addition to others at an earlier stage of post-operative care of the patient.

Accordingly, we think that the judgment must be affirmed.

*Judgment affirmed, with costs.*