824 A.2d 1140

**Kevin TOOGOOD, Appellee**

**v.**

**Owen J. ROGAL, D.D.S., P.C., and Owen J. Rogal, D.D.S., Individually and d/b/a The Pain Center and Hrant Stone, M.D., by Thomas Stone, Executor of the Estate of Hrant Stone, M.D., Appellants.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 2002.

Decided May 29, 2003.

246

John Jacob Hare, Charles W. Craven, Philadelphia, for Owen J. Rogal, Appellant.

Frank A. Gerolamo, Philadelphia, for Thomas Stone, Executor of the Estate of Hrant Stone, M.D., Appellant.

Joseph Patrick Green, Bellefonte, for Kevin Toogood, Appellee.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice NEWMAN.

In a medical malpractice action, a jury awarded Kevin Toogood (Appellee or Mr. Toogood) the sum of $465,000.00. This Court granted allowance of appeal to decide whether the Court of Common Pleas of Philadelphia County (trial court) erred in failing to grant the Motions of Appellants [1] for nonsuit and/or directed verdict based upon the absence of expert liability evidence to establish medical malpractice.

## FACTS AND PROCEDURAL HISTORY

Mr. Toogood was involved in two automobile accidents. The first occurred in 1989 and the second in 1992. In the 1992 accident, he sustained injuries to his head, jaw, back, and shoulder. By August of 1993, the residual pain from his injuries was so severe he said that he "wanted to die." Despite the fact that he was treated by several physicians and

1. Appellants in this case are Owen J. Rogal, D.D.S. (Dr. Rogal), individually and doing business as The Pain Center, and Hrant Stone, M.D. (Dr. Stone), by Thomas Stone, Executor of the Estate of Hrant Stone, M.D. Dr. Rogal and The Pain Center are identified individually and collectively referred to as the "Rogal Defendants."

prescribed strong medication, the pain continued. In August of 1993, upon referral by one of his physicians, Mr. Toogood began to visit Dr. Rogal, a dentist, for treatment of jaw pain. These visits occurred at The Pain Center, a multi-disciplinary medical center that is owned primarily by Dr. Rogal. While at The Pain Center for treatment of his jaw pain, Mr. Toogood also received paravertebral nerve block [2] injections from Dr. Stone, a consulting anesthesiologist at The Pain Center, for treatment of severe back, shoulder, and neck pain.

On December 13, 1993, Mr. Toogood received four paravertebral nerve block injections from Dr. Stone. After receiving the final injection, Mr. Toogood felt pain, experienced difficulty breathing, and remained at The Pain Center for a short time before driving himself home. While at home, he collapsed and was taken to The Chester County Hospital complaining of breathing difficulties. At the hospital, he was treated by William Dellevigne, M.D. (Dr. Dellevigne), who diagnosed and repaired a pneumothorax.[3] Mr. Toogood fully recovered from the injury and, as Dr. Dellevigne recalled, he never returned for a follow-up visit. The hospital charges for his treatment totaled $15,333.00, and, because Appellee had not worked since the 1992 car accident, the pneumothorax and his resulting hospitalization did not cause him to incur lost wages.

Mr. Toogood filed a complaint against Dr. Stone and the Rogal Defendants on February 21, 1996. The complaint alleged claims of negligence and battery against Dr. Stone and asserted direct and vicarious liability claims against the Rogal Defendants. Prior to trial, Mr. Toogood withdrew the claims of direct liability and proceeded against the Rogal Defendants solely on the basis of vicarious liability.

2. A paravertebral nerve block is an injection of a substance into a nerve along the vertebral column to arrest the passage of the nervous impulse. *See Stedman's Medical Dictionary,* 178, 1031 (26th ed.1995).

3. A pneumothorax, commonly called a collapsed lung, involves the "presence of air or gas in the pleural cavity," which can impair respiratory function. *Id.* at 1111.

On February 23, 1996, two days after the filing of the instant action and before he could be deposed, Dr. Stone died and Appellant, Thomas Stone, the executor of Dr. Stone's estate, was substituted as a defendant. The only other person in the room at the time of the nerve block injection was Dr. Stone's son, Richard Stone, a nurse anesthetist. He also died before his deposition could be taken.

The trial judge precluded Appellee from presenting expert medical testimony at trial because he failed to submit the report of his medical expert in a timely manner. Appellants then verbally requested a grant of summary judgment due to the absence of expert medical testimony. However, because Appellee asserted that he could establish a *prima facie* case by application of the doctrine of *res ipsa loquitur*, he was allowed to proceed to trial only on that basis.

Further, as a result of the deaths of Dr. Stone and his son, Dr. Stone's estate filed a motion for summary judgment asserting that, pursuant to the Dead Man's Act, 42 Pa.C.S. § 5930, no adverse testimony could be offered against Dr. Stone and that, because Appellee failed to provide expert testimony necessary to establish a *prima facie* case of medical negligence, Appellee would be unable to succeed. This motion was uncontested and, by Order dated September 2, 1997, the trial judge granted the motion and dismissed all claims against Dr. Stone, except the cross-claim of the Rogal Defendants against Dr. Stone for contribution.

At trial, testimony was received from Appellee and Dr. Rogal, and video deposition testimony from Dr. Dellevigne was presented. The trial court then allowed the case to go to the jury with a *res ipsa loquitur* instruction without expert testimony as to the standard of care, over the objection of the Rogal Defendants.

On October 23, 1998, the jury rendered a verdict in favor of Mr. Toogood and against the Rogal Defendants in the amount of $465,000.00. Appellants filed timely post trial motions for a new trial, remittitur, and judgment *non obstante veredicto*, which the trial judge denied.

The Superior Court affirmed the decision of the trial court in a published opinion. *Toogood v. Rogal,* 764 A.2d 552 (Pa.Super.2000), *petition for allowance of appeal granted in part,* 568 Pa. 38, 791 A.2d 1154 (2002). The Rogal Defendants asserted on appeal to the Superior Court that Appellee's case of medical malpractice should not have been permitted to proceed to the jury without expert testimony on negligence, particularly the standard of care. They also argued that, because Dr. Stone had been dismissed from the case, they should have been granted a dismissal, remittitur, or a new trial.

The Superior Court found that the trial judge properly granted summary judgment in favor of Dr. Stone based on the Dead Man's Act. The court outlined the elements of a *prima facie* case of medical malpractice, but concluded that the doctrine of *res ipsa loquitur* permits a jury to infer the existence of negligence and causation where the injury at issue is one that does not ordinarily occur in the absence of negligence. Citing to this Court's recent decision in *Hightower–Warren v. Silk,* 548 Pa. 459, 698 A.2d 52 (1997),[4] as well as decisions from other jurisdictions that the panel considered to be analogous,[5] the Superior Court determined that Appellee

4. In *Hightower-Warren,* a plaintiff who suffered injury to his vocal cords during thyroid surgery was deemed to have properly invoked the doctrine of *res ipsa loquitur.*

5. *See Bardessono v. Michels,* 3 Cal.3d 780, 91 Cal.Rptr. 760, 478 P.2d 480, 487 (1970) (observing that "the giving and receiving of injections and the lack of nerve injury therefrom ordinarily has become a matter of common knowledge"); *Killingsworth v. Poon,* 167 Ga.App. 653, 307 S.E.2d 123, 126 (1983) ("it is widely known ... that subcutaneous injections ostensibly given only for the relief of muscular pain should not, if administered correctly, result in the puncture of internal organs"); *Baker v. Chastain,* 389 So.2d 932, 934 (Ala.1980) (a scintilla of evidence to support a theory of negligence can get a case to the jury); *Stumph v. Foster,* 524 N.E.2d 812, 815 (Ind.Ct.App.1988) (concluding that expert testimony is not required to establish the requisite standard of care to survive summary judgment because laypersons are competent to infer a doctor's negligence where he broke the patient's rib in rendering chiropractic care). *But see Cherokee County Hosp. Auth. v. Beaver,* 179 Ga.App. 200, 345 S.E.2d 904, 906 (1986) (holding that evidence that the patient developed pain radiating down her leg following an injection was insufficient, without expert medical testimony, to find that the injection was negligently given); 45 A.L.R. 731, 739 (1972)

met the elements essential to his burden of proof. The court also cited the opinion in *Hightower–Warren* to support its determination that, when a patient receives an injection, it is within the common knowledge of laypersons to know that a collapsed lung happens only because of negligence.

Finally, the Superior Court rejected the claim of the Rogal Defendants that they should have been dismissed from the case upon Dr. Stone's dismissal and concluded that the Rogal Defendants had confused a valid defense of immunity with the defense of release and satisfaction and "evidence[d] a profound misapprehension of the nature of the vicarious liability of a principal for the tortious acts of his agent." *Toogood*, 764 A.2d at 559.

## DISCUSSION

### Medical Malpractice

▮▮▮▮ "Two traditional cornerstones of tort law—liability based on fault and trial by jury—have been incorporated into the law of medical negligence." *Malpractice and Medical Testimony*, 77 HARV. L.REV. 333, 334 (1963). Suits by patients against their doctors have been brought in this Commonwealth for over a century [6] and when a plaintiff's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions. As such, medical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services. *See, e.g., Hodgson v. Bigelow*, 335 Pa. 497, 7 A.2d 338 (1939). Thus, to prevail in a medical malpractice action, a plaintiff must "establish a duty

(noting that "in situations where a patient sustained an injury after an injection[,] the courts have usually refused to apply the doctrine of res ipsa loquitur [because] the full spectrum of possible consequences from the giving of a shot were not within the layman's common knowledge ... the courts thus holding that at least a minimum showing by expert testimony was generally required that there had been some variance from recognized standards of care....").

6. *See, e.g., Bemus v. Howard*, 3 Watts 255 (Pa.1834).

owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm." *Hightower–Warren,* 698 A.2d at 54. Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury. *Id.*

The expert testimony requirement in a medical malpractice action means that a plaintiff must present medical expert testimony to establish that the care and treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury. Hence, causation is also a matter generally requiring expert testimony. A very narrow exception to the requirement of expert testimony in medical malpractice actions applies "where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons," *Hightower–Warren,* 698 A.2d at 54 n. 1, also conceptualized as the doctrine of *res ipsa loquitur.*

## Res Ipsa Loquitur

The *res ipsa loquitur* doctrine originated in English courts in the nineteenth century. The now infamous 1863 case of *Byrne v. Boadle,* 159 Eng. Rep. 299 (Ex. 1863), involved an injury to a passerby when a barrel of flour rolled from the defendant's shop window above and struck the plaintiff in the head. The issue at trial involved the necessity that plaintiff prove that the defendant was, in fact, negligent. In determining that the falling barrel was *prima facie* evidence of negligence, Chief Baron Pollock casually stated that the occurrence of the accident spoke for itself, coining the phrase *"res ipsa loquitur."* Two years later, in *Scott v. The London & St. Catherine Docks Co.,* 159 Eng. Rep. 665, 667 (Ex. 1865), Chief Justice Erle presented the first clear statement of the doctrine:

> There must be reasonable evidence of negligence. But where the thing is shewn to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant that the accident arose from want of care.

*D'Ardenne by D'Ardenne v. Strawbridge & Clothier, Inc.,* 712 A.2d 318, 320–21 (Pa.Super.1998) (quoting *Scott*).

*Res ipsa loquitur* reflects a common sense understanding that an inference of negligence may be raised without direct evidence of the negligent act if three conditions exist: (1) the injury must be of a type not ordinarily occurring absent negligence; (2) the defendant must have had exclusive control of the instrumentality effecting the injury; and (3) the plaintiff must not have contributed to the injury. *See, e.g., Greathouse v. Horowitz,* 439 Pa. 62, 264 A.2d 665 (1970); *Loch v. Confair,* 372 Pa. 212, 93 A.2d 451 (1953). Until recently, it was generally understood that *res ipsa loquitur* was not applicable in medical malpractice cases.[7]

*Res ipsa loquitur* is neither a doctrine of substantive law nor a theory of recovery; rather, it is a rule of circumstantial evidence. Nor is this doctrine to be employed simply because the treatment caused injury or failed to yield the expected result. Courts have continually stated that an injury alone is insufficient to prove negligence in medical malpractice cases.[8]

The doctrine of *res ipsa loquitur* allows plaintiffs, without direct evidence of the elements of negligence, to

---

7. *See, e.g., Shaw v. Irvin,* 418 Pa. 251, 210 A.2d 285 (1965); *Austin v. Kaufman,* 203 Ga.App. 704, 417 S.E.2d 660 (1992); *Lane v. Calvert,* 215 Md. 457, 138 A.2d 902 (1958); *McDermott v. St. Mary's Hosp. Corp.,* 144 Conn. 417, 133 A.2d 608 (1957); *Rosson v. Hylton,* 45 Wyo. 540, 22 P.2d 195 (1933).

8. *See, e.g., Miller v. Delaware Co. Mem'l Hosp.,* 428 Pa. 504, 239 A.2d 340 (1968); *Engle v. Spino,* 425 Pa. 254, 228 A.2d 745 (1967). *See also, Jones v. Porretta,* 428 Mich. 132, 405 N.W.2d 863 (1987); *Thomas v. St. Francis Hosp.,* 447 A.2d 435 (Del.1982).

present their case to the jury based on an inference of negligence. The key to the doctrine is that a sufficient fund of common knowledge exists within a jury of laypersons to justify raising the inference. Instead of directly proving the elements of ordinary negligence, the plaintiff provides evidence of facts and circumstances surrounding his injury that make the inference of the defendant's negligence reasonable. "The gist of res ipsa loquitur ... is the inference, or process of reasoning by which the conclusion is reached. This must be based upon the evidence given, together with a sufficient background of human experience to justify the conclusion. It is not enough that plaintiff's counsel can suggest a possibility of negligence." Prosser & Keeton, *The Law of Torts* § 39, p. 243 (5th ed.1995). This theory relieves the plaintiff of having to prove causation directly.

### Res ipsa loquitur in Medical Malpractice Actions

Historically, *res ipsa loquitur* has had a limited role in medical malpractice cases and the application of the doctrine to those cases is a comparatively recent development. Previously, the fact that medicine is not an exact science, that the human body is not susceptible to precise understanding, that the care required of a medical professional is the degree of learning and skill common in his profession, and that, even with the greatest of care, untoward results do occur in medical and surgical procedures, were of elevated importance in determining whether the medical professional had been negligent. *Salgo v. Stanford Univ. Bd. of Trustees,* 154 Cal.App.2d 560, 317 P.2d 170 (1957). Originally, a plaintiff could not employ a *res ipsa loquitur* instruction if the plaintiff had evidence regarding the cause of the accident. Thus, *res ipsa loquitur* was reserved for obvious cases in which lay jurors could apply their own knowledge and common sense to establish the cause of the injury and deduce an inference of negligence. These were typically the "sponge left in the patient" cases.

An unfortunate result such as death or infection could not, by itself, establish liability and, when an injurious result was a common side effect of the treatment that could occur without

negligence, courts refused to allow patients to use *res ipsa loquitur.*[9] Further, when the treatment employed was generally accepted, the mere fact that a patient experienced an unfavorable reaction did not invoke *res ipsa loquitur.*[10]

Prior to the decision of this Court in *Jones v. Harrisburg Polyclinic Hosp.*, 496 Pa. 465, 437 A.2d 1134 (1981), Pennsylvania medical malpractice case law conflicted fundamentally with *res ipsa loquitur* case law and a *res ipsa loquitur* theory could not support a medical malpractice claim. Customarily, in medical malpractice cases, courts of this Commonwealth demanded that plaintiffs meet rigorous evidentiary requirements or suffer summary judgment. The doctrine of *res ipsa loquitur*, in contrast, offers plaintiffs a procedural bypass to at least an inference, if not a direct proof, of negligence.

### Restatement (Second) Torts § 328D

In *Gilbert v. Korvette, Inc.*, 457 Pa. 602, 327 A.2d 94 (1974),[11] this Court adopted the Restatement (Second) of Torts § 328D formulation of *res ipsa loquitur.*[12] Six years later, the Court

**9.** *See, e.g., Chism v. Campbell*, 250 Neb. 921, 553 N.W.2d 741 (1996) (doctrine inapplicable where fixed percentage of patients would suffer this same injury even in the absence of negligence); *Tappe v. Iowa Methodist Med. Ctr.*, 477 N.W.2d 396 (Iowa 1991) (stroke occurs in fixed percentage of all by-pass surgeries even in absence of negligence); *Sousa v. Chaset*, 519 A.2d 1132 (R.I.1987) (because side effects from surgery could occur in absence of negligence, *res ipsa loquitur* is inapplicable).

**10.** *Hodgson v. Bigelow, supra; Duckworth v. Bennett*, 320 Pa. 47, 181 A. 558 (1935). *See also Sisson by and through Allen v. Elkins*, 801 P.2d 722 (Okla.1990) (the fact that surgeon employed methods accepted by the profession would not invoke *res ipsa loquitur* even though expert witness testified that patient should have been placed on heart by-pass before surgery).

**11.** *Gilbert* involved liability of a storeowner and escalator manufacturer for injuries sustained by a toddler whose foot became caught in one of the escalator steps. The child suffered the loss of part of his left great toe and general disfiguration and deformity of his foot.

**12.** Section 328D states:

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when
(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

reversed its long-standing position against the use of *res ipsa loquitur* in medical malpractice cases and allowed its application to permit recovery via Section 328D. *Jones.* We concluded that "Section 328D is fashioned to reach all instances where negligence may properly be inferred...." *Jones,* 437 A.2d at 1138 (discussing *Gilbert*). In so doing, we rejected the three theories of circumstantial evidence that had previously populated our law in this area.[13]

In Jones, the patient emerged from gynecological surgery with permanent damage to her ulna nerve. Both parties presented expert medical testimony as to the standard of care, but expert testimony was deficient as to causation. Thus, in *Jones* we said:

> We are satisfied that expert testimony should no longer be a *per se* requirement in proof of negligence in all cases of alleged medical malpractice. Expert medical testimony only becomes necessary when there is no fund of common knowledge from which laymen can reasonably draw the inference or conclusion of negligence. Even where there is no fund of common knowledge, the inference of negligence should be permitted where it can be established from expert medical testimony that such an event would not ordinarily occur absent negligence. Restated, section 328D provides two avenues to avoid the production of direct medical evidence of the facts establishing liability: one being the reliance upon *common lay knowledge* that the event would not have occurred without negligence, and the second, the

> (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.
> (2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.
> (3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

**13.** Those theories comprised "one entitled 'res ipsa loquitur,' the second entitled 'exclusive control,' and the third was an untitled simple circumstantial evidence theory." *Jones,* 437 A.2d at 1137 n. 8.

reliance upon *[expert] medical knowledge* that the event would not have occurred without negligence.

*Jones,* 437 A.2d at 1138 (internal footnote omitted) (emphasis added). In arriving at this determination, we specifically relied upon comment d to Section 328D, which states:

d. Basis of conclusion. In the usual case the basis of past experience from which this conclusion may be drawn is common to the community, and is a matter of general knowledge, which the court recognizes on much the same basis as when it takes judicial notice of facts [that] everyone knows. It may, however, be supplied by the evidence of the parties; and **expert testimony that such an event usually does not occur without negligence may be essential to the plaintiff's case where, as for example in some actions for medical malpractice, there is no fund of common knowledge which may permit laymen reasonably to draw the conclusion.** On the other hand there are other kinds of medical malpractice, as where a sponge is left in the plaintiff's abdomen after an operation, where no expert is needed to tell the jury that such events do not usually occur in the absence of negligence.

Restatement (Second) of Torts § 328D, cmt. d (1965) (emphasis added). We concluded that "[t]he need for an inference of negligence is especially obvious in the situation where a patient submits himself or herself to the care and custody of doctors and nurses, is rendered unconscious, and receives some injury from instrumentalities used or procedures employed in his or her treatment." *Jones,* 437 A.2d at 1139. Thus, the *Jones* Court reasoned that *res ipsa loquitur,* as expressed in Section 328D, may be applicable to allow an inference as to whether a defendant is responsible for causing the injury. Notably, the application of the common knowledge facet of the doctrine in *Jones* was applied to a set of facts involving an unconscious patient; also in Jones, expert testimony was produced relative to the standard of care. It was the element of causation to which the *res ipsa loquitur* doctrine was applied.

 Courts sitting in medical malpractice cases require detailed expert testimony because a jury of laypersons generally lacks the knowledge to determine the factual issues of medical causation; the degree of skill, knowledge, and experience required of the physician; and the breach of the medical standard of care. In contrast, plaintiffs in *res ipsa loquitur* cases rely on the jury to fill in the missing pieces of causation and negligence, inherent in their cases, with the jury's common experience. Determining whether there was a breach of duty, however, involves a two-step process: the court must first determine the standard of care; it then must examine whether the defendant's conduct measured up to that standard. Not only does the plaintiff have the burden of proving that the defendant did not possess and employ the required skill and knowledge, or did not exercise the care and judgment of a reasonable professional, he or she must also prove that the injury was caused by the failure to employ that requisite skill and knowledge. We have previously concluded that this must be accomplished with expert medical testimony presented at trial by doctors testifying as expert witnesses.[14]

 *Res ipsa loquitur* must be carefully limited, for to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury. Thus, in evaluating a doctor's decision to administer a nerve block injection in a particular location, an intelligent jury analysis requires some under-

14. In *Chandler v. Cook*, 438 Pa. 447, 265 A.2d 794, 796 n. * (Pa.1970), this Court opined that, "in malpractice cases ... a jury will not be permitted to find negligence without expert testimony to establish variance from accepted medical practice" and that "the only exception to the requirement that expert testimony must be produced is where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons." (quoting *Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167 (1963)). *See also Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968). We note that the adoption of the language of Section 328D by this Commonwealth does not undermine the precedential value of the foregoing cases because the language of Section 328D(1)(a) essentially adopts this strict preliminary requirement for application of the doctrine.

standing of the results of giving the injection in various places; the skill required in pinpointing a specific location; and the likelihood of giving the injection in an unintended site. We reaffirm our earlier conclusion, set forth in numerous decisions of this Court [15] that, medicine being an applied science, the realm of reasonable choice is best defined by those engaged in the practice, and expert medical testimony on this issue is required. As aptly noted by the Justices of the Supreme Court of New Mexico, "The cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion.... [Without experts] we feel that the jury could have no basis other than conjecture, surmise or speculation upon which to consider causation." *Woods v. Brumlop*, 71 N.M. 221, 377 P.2d 520, 523 (1962).

■ It follows that, pursuant to Section 328D, three conditions must be met before the doctrine of *res ipsa loquitur* may be invoked: (a) either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event. It is only when each of the three conditions is satisfied that an inference of negligence can be drawn from the occurrence of an injurious event. As dictated by Section 328D, the applicability of the doctrine depends, in the first instance, upon whether the damaging event ordinarily does not occur in the absence of negligence.

■ Appellee, in the instant action, sought to recast his cause of action as something other than a medical malpractice claim to avoid the requirement of expert medical testimony. His theory was that, in the absence of negligence, a punctured lung ordinarily would not result from an injection of cortisone. We conclude that his theory was too simplistic and not an accurate reflection of the procedure in this case. A more

**15.** See note 14, *supra.*

appropriate characterization is whether, in the absence of negligence, the injection of a paravertebral nerve block results in a pneumothorax.

A physician owes his patient a duty to employ that degree of knowledge, skill, and care ordinarily possessed by members of the medical profession. *Hodgson.* There is no requirement that he be infallible, and making a mistake is not negligence as a matter of law. In order to hold a physician liable, the burden is upon the plaintiff to show that the physician failed to employ the requisite degree of care and skill. *Brannan v. Lankenau Hosp.*, 490 Pa. 588, 417 A.2d 196 (1980); *Bierstein v. Whitman*, 360 Pa. 537, 62 A.2d 843 (1949). We reiterate that the degree of care and skill can only be proven by the testimony of experts. *Chandler.* The injection of a paravertebral nerve block involved professional treatment at a professional level. While some jurisdictions have held that adverse results of administering injections subcutaneously are within the common knowledge of laypersons,[16] the performance of a paravertebral nerve block involves complex issues of anatomy, medical science, invasive procedures, and precision performance. Therefore, it was essential to Mr. Toogood's claim to introduce expert testimony. This testimony was needed to establish first, the standard of care required for the procedure and, second, that the physician breached that standard of care. These are essential elements for a medical malpractice action that do not evaporate when the doctrine of *res ipsa loquitur* is applied. Accordingly, Mr. Toogood failed to establish his *prima facie* case of medical malpractice and the trial court committed errors of law in permitting this matter to go to the jury without expert testimony as to the standard of care and in subsequently denying Appellants' motion for judgment *non obstante veredicto.*

## CONCLUSION

The art of healing frequently calls for a balancing of risks and dangers to a patient. Consequently, if injury results from

16. See note 3, *infra,* and accompanying text.

the course adopted, where no negligence or fault is present, liability should not be imposed upon the institution or agency actually seeking to assist the patient. In addition, medical uncertainties exist because each patient is unique, and undesirable results occur even when the diagnosis is correct and treatment is properly administered. We are reminded of the words of former President and Chief Justice Taft, sitting as an Ohio Circuit Judge, who opined:

> A physician is not a warrantor of cures. If the maxim, "Res ipsa loquitur" were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the "ills that flesh is heir to."

*Ewing v. Goode,* 78 F. 442, 443 (C.C.S.D.Ohio 1897) (Taft, J.). Physicians and surgeons do not undertake to ensure the outcome of their care and the result of medical treatment or surgery is not so certain that an inference of negligence attends a failed result.

Public policy reasons exist for protecting physicians by limiting *res ipsa loquitur* inferences in medical cases, which must be weighed against the policy concerns of protecting the general public. First, doctors hold an important place in our society due to the role that they play in the health and even survival of the peoples of this nation. For that reason, society should not allow a doctor's actions to be second-guessed at trial without a clear understanding of the standards required. Second, medicine is not an exact science. Much discretion exists in a doctor's practice of medicine that should not be condemned in hindsight. Third, the practice of medicine is a complex and experimental field. Therefore, expert testimony is necessary to prevent a finding of liability for a simple mistake of judgment, failure of treatment, or an accidental occurrence. *See generally* Karyn K. Ablin, *Res Ipsa Loquitur and Expert Opinion Evidence in Medical Malpractice Cases: Strange Bedfellows,* 82 VA. L.REV. 325, 353–55 (March 1996).

Relaxing the burden of proof in medical malpractice cases might correct a perceived unfairness to some plaintiffs who could prove the *possibility* that medical malpractice caused an injury but could not prove its *probability*. However, health care providers might then find themselves defending cases simply because a patient failed to improve or when serious disease processes were not arrested and where another course of action might possibly have brought a better result. No other professional malpractice defendant carries this burden of liability without the requirement that plaintiffs prove the alleged negligence probably, rather than possibly, caused the injury. Thus, we cannot approve the substitution of such an obvious inequity for a perceived one.

The Order of the Superior Court is reversed.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justices CASTILLE and SAYLOR concur in the result.

Justice NIGRO files a dissenting opinion.

Justice NIGRO dissenting.

Under the doctrine of *res ipsa loquitur* as adopted by this Court, a medical malpractice plaintiff can proceed on a theory of negligence without expert testimony as to the standard of care or causation where:

(a) the event is of the kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

*Hightower–Warren v. Silk*, 548 Pa. 459, 698 A.2d 52, 54 (1997) (citing Restatement (Second) of Torts § 328(D)(1965)). As I believe that these three requirements are satisfied in the instant case, I disagree with the majority's conclusion that Toogood could not proceed in the absence of expert testimony regarding the standard of care.

At trial, Toogood presented evidence that Dr. Stone had punctured his lung with a needle while giving him a routine nerve block injection in his back and that the puncture caused his lung to collapse. These facts, in my view, clearly satisfy the first prong of the *res ipsa* test because it is generally understood that in the absence of negligence, such an injection does not ordinarily puncture a lung and cause it to collapse.[1] *See Killingsworth v. Poon,* 167 Ga.App. 653, 307 S.E.2d 123, 126 (1983) ("it is widely . known ... that a subcutaneous injection ostensibly given only for the relief of muscular pain should not, if administered correctly, result in the puncture of internal organs."); *see also Bardessono v. Michels,* 3 Cal.3d 780, 91 Cal.Rptr. 760, 478 P.2d 480, 486–87 (1971) ("Needle injections of cold shots, penicillin, and many other serums have become commonplace today. Hardly a man, woman or child (even those of tender age) exists in this country who has not had injections of one kind or another. * * * So the giving and receiving of injections and the lack of nerve injury therefrom ordinarily has become a matter of common knowledge") (alteration in original) (citation omitted). Moreover, I believe that the second prong of the *res ipsa* test is satisfied not only because there was no genuine dispute in this case that Dr. Stone was the individual who gave the injection, but also because Toogood presented specific expert testimony that the injection caused the collapsed lung. Finally, the third prong of the *res ipsa* test was plainly satisfied because, as this Court recognized in *Hightower–Warren,* it is "within the scope of [a physician's] duty of care to protect his patient against preventable injuries which could reasonably occur during the performance of surgery," and the same holds true for the medical procedure at issue here. 698 A.2d at 55 n. 7 (alterations in original) (citation omitted).

The majority nevertheless concludes that Toogood cannot proceed on a *res ipsa loquitur* theory, reasoning that laypersons cannot draw on their common knowledge to conclude that such events do not ordinarily occur .in the absence of negligence, because the injection "involved complex issues of anato-

1. The injection at issue in this case was the fourth such injection that Toogood had received in Dr. Stone's office that very day.

my, medical science, invasive procedures, and precision performance." Op. at 263, 824 A.2d at 1150. Whether or not any such complexities actually exist, I do not agree that the fact that special skill and training may be required to perform a nerve block injection precludes the application of *res ipsa loquitur* on the facts of this case, where the needle punctured Toogood's lung. Surely, a jury can draw on its common general knowledge to infer that a nerve block injection needle should never puncture the patient's lung absent the doctor's negligence. *See* Restatement (Second) of Torts § 328D cmt. e ("[I]t is enough that the facts proved reasonably permit the conclusion that negligence is the more probable explanation."). Of course, the defendant remains free under the *res ipsa loquitur* doctrine to rebut the inference of negligence with its own evidence that such injections pose a greater risk of organ puncture than common perception suggests.

For the foregoing reasons, I dissent and would affirm the order of the Superior Court insofar as it permitted Toogood to proceed on a theory of *res ipsa loquitur*.