J-A16022-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARYJANE HENRY, EXECUTRIX OF THE ESTATE OF SCOTT E. HENRY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICHOLAS F. COLANGELO, PH.D., CLEARBROOK FOUNDATION, INC., ALBERT D. JANERICH, M.D., ALBERT D. JANERICH & ASSOCIATES, MATTHEW A. BERGER, M.D., MATTHEW A. BERGER, M.D., P.C. | : | No. 1580 MDA 2020 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ALBERT D. JANERICH, M.D., ALBERT D. JANERICH & ASSOCIATES, MATTHEW A. BERGER, M.D., MATTHEW A. BERGER, M.D., P.C. | : | |

Appeal from the Order Entered October 7, 2020
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2019-CV-14101

BEFORE: KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.: **FILED: AUGUST 24, 2021**

In this interlocutory appeal by permission, Albert D. Janerich, M.D.,

Albert D. Janerich & Associates (collectively, Janerich) Matthew A. Berger,

M.D., and Matthew A. Berger, M.D., P.C. (collectively, Berger) (thus, all

appellants: Janerich and Berger) appeal the order entered October 7, 2020 in

_____

[*] Former Justice specially assigned to the Superior Court.

the Court of Common Pleas of Luzerne County overruling their preliminary objections to dismiss the complaint against them.

The trial court provides the following summary:

Plaintiff [Maryjane Henry, Executrix of the Estate of Scott E. Henry (the Henry Estate)] is the surviving spouse of Scott E. Henry . . . and filed the instant action as executrix of the estate of Decedent. Defendant Colangelo is an adult individual who held himself out as a licensed mental health professional and/or qualified mental health counselor to the community, Decedent, and the family of Decedent. Defendant Colangelo represented in words or substance, to Decedent and Decedent's family that he was experienced and sufficiently qualified to manage the mental health crisis being experienced by Decedent and that he could do so safely and with all requisite experience. At all times material to the instant matter, Defendant Colangelo was an employee of Defendant Clearbrook, a professional corporation or other similarly-configured business entity. Defendant Janerich, at all times material hereto, was a physician licensed to practice medicine in Pennsylvania, specializing in psychiatry, and was an employee of Defendant Berger Corporation.

Decedent was sixty years old and had a medical history that was significant for drug and alcohol addiction, depression, anxiety, mood disorder, and impulse control problems. Decedent had been sober for over eighteen years and attended various treatment programs and supportive services including Alcoholics Anonymous, at which Decedent became acquainted with Defendant Colangelo. Defendant Colangelo had no education, training, or experience with respect to the counseling and/or treatment of mental health patients. Defendant Colangelo held himself out, nonetheless, as "Dr. Colangelo," and represented in his professional biography and elsewhere that he had significant clinical expertise in mental health counseling and treatment. Defendant Colangelo undertook to provide mental health counseling and treatment to Decedent.

In October of 2018, Decedent experienced a drastic worsening of his mental health which included persistent insomnia, anxiety, depression, thoughts of self-harm, and thoughts of suicide. Between October and December 13, 2018,

Decedent repeatedly reported his mental health symptoms, including thoughts of self-harm and suicide, to Defendant Colangelo, and despite a lack of any training, experience, certifications, or licenses as a mental health professional, Defendant Colangelo provided mental health counseling and therapy to Decedent during this time frame. Upon receiving Decedent's complaints, Defendant Colangelo expressly told Decedent and Decedent's family that Defendant Colangelo would help Decedent and guide him through this difficult time[;] in that regard, Defendant Colangelo arranged medical appointments for Decedent, discussed his treatment and prescriptions with physicians who wrote those prescriptions, and generally acted as a healthcare professional coordinating the care and management of Decedent's mental health treatment. During this time period, Defendant Colangelo learned that Decedent was suicidal, had guns in his home, and had a plan to harm himself, but Defendant Colangelo failed to inform the legal authorities, mental health professionals, or Decedent's family about Decedent's plan for self-harm. Defendant Colangelo communicated assurances to Decedent's son that Defendant Colangelo had a treatment plan in place for Decedent's condition and was coordinating care with other professionals.

On or about October 27, 2018, Defendant Colangelo began communicating about Decedent with Defendant Janerich, at which time Defendant Janerich began providing medical treatment to Decedent, despite his areas of expertise being physiatry and addiction medicine.[1] On October 27, 2018, Decedent received sleeping medication prescribed by Defendant Janerich, and on November 1, 2018, Decedent received additional medications that were prescribed by Defendant Janerich. On November 7, 2018, Decedent was first evaluated by Defendant Janerich "after [Defendant Janerich] communicat[ed] with Nick Colangelo." Defendant Janerich diagnosed Decedent with an "unspecified mood (affective) disorder" and prescribed Naproxen (pain medication), Trazadone (sleeping/anti-anxiety medication), and Melatonin. On November 8th, 20th, and 30th of 2018, Decedent

---

[1] Physiatry is a branch of medicine concerned with restoring and enhancing functional ability and quality of life for people with physical impairments or disabilities, such as stroke, brain injury, or muscle or nerve damage.

presented to Defendant Janerich, reporting depression, and on the second of these visits also reporting thoughts of self-harm.

On or before December 10, 2018, Defendant Colangelo began communicating about Decedent with Defendant Berger, a licensed psychiatrist. On that date, Decedent was evaluated by Defendant Berger at the request of Defendant Colangelo, at which time Decedent reported to Defendant Berger he had been experiencing increased anxiety, increased depression, impaired concentration, ruminations, poor sleep, anergia, inability to function, inability to work, and being overwhelmed. Defendant Berger diagnosed Decedent with generalized anxiety disorder and major depressive disorder and prescribed two new medications. On December 12, 2018, Decedent called the office of Defendant Berger to report that his medications were not working, but the phone call was not returned.

On the morning of December 13, 2018, Decedent was found, presumably deceased, in his home with a self-inflicted gunshot wound to the head.

Trial Ct. Op., 1/27/21, at 3-7.

The Henry Estate filed the present action, sounding in negligence and arising under the Wrongful Death Act and the Survival Act.[2] This interlocutory appeal arises from the overruling of the defendants' preliminary objections. On October 7, 2020, the trial court denied a requested stay pending appeal, but granted a defense request to amend the orders overruling preliminary objections such that those orders would be immediately appealable under 42 Pa.C.S. § 702(b), which governs interlocutory appeals by permission. Trial Ct. Op. at 3. On December 30, 2020, this Court granted permissive appeal.[3]

_____

[2] 42 Pa.C.S. §§ 8301 and 8302.

[3] Codefendants Nicholas F. Colangelo, Ph.D. (Colangelo) and Clearbrook Foundation, Inc. (Clearbrook) also appeal; *see Henry v. Colangelo, et al.*, 1579 MDA 2020.

- 4 -

[O]ur standard of review of an order of the trial court overruling or [sustaining] preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.

Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Haun v. Community Health Systems, Inc.*, 14 A.3d 120, 123 (Pa. Super. 2011) (citations omitted).

"[W]hen a plaintiff's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003). Negligence is established by proving the following four elements: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Estate of Swift by Swift v. Northeastern Hosp.*, 690 A.2d 719, 722 (Pa. Super. 1997). In any negligence action, "establishing a breach of a legal duty is a condition precedent to a finding of negligence." *Id.*

Janerich and Berger frame the question presented thusly:

Whether the trial court erred in refusing to grant the Preliminary Objections of [Janerich and Berger] and dismiss the Second Amended Complaint . . . as duty does not arise to prevent the suicide of a patient when a physician and/or psychiatrist, who does not exercise any type of custody or control over the patient, treats the patient on an out-patient, voluntary basis only for medical and/or mental health issues, and where the facts pleaded, even if true, fail to establish application of any of the limited exceptions to the longstanding general rule of Pennsylvania law – that one cannot be liable for the suicide of another.

Janerich and Berger Brief at 4. Janerich and Berger argue that the trial court erroneously applied the law in overruling preliminary objections, because **McPeake v. William T. Cannan, Esq., P.C.**, 553 A.2d 439 (Pa. Super. 1989), and its progeny establish that death by suicide cannot occasion a wrongful death recovery. Janerich and Berger Brief at 10, 11-32.[4] **McPeake** arises from a courtroom suicide after a guilty verdict was returned in a criminal trial; it is a legal malpractice case. **McPeake**, 553 A.2d at 440-441. **McPeake** includes the following recitation in its summary of the law at that time:

Generally, suicide has not been recognized as a legitimate basis for recovery in wrongful death cases. This is so because suicide constitutes an independent intervening act so extraordinary as not to have been reasonably foreseeable by the original tortfeasor. There are, however, limited exceptions to this rule. For example, Pennsylvania has recognized suicide as a legitimate basis for wrongful death claims involving hospitals, mental health institutions and mental health professionals, where there is a custodial relationship and the defendant has a recognized duty of care towards the decedent. In other cases, where the defendant was not associated with a hospital or mental health institution,

_____

[4] Janerich and Berger also argue that the trial court improperly relied on two trial court opinions. Janerich and Berger Brief at 49-57. Because we conclude that the trial court had sufficient grounds for overruling preliminary objections in the absence of those opinions, we need not address this argument.

courts have required both a clear showing of a duty to prevent the decedent's suicide and a direct causal connection between the alleged negligence and the suicide. A third line of cases which have recognized suicide as a basis for recovery involve suits brought under the worker's compensation statute. Under this statute, compensation will be granted if a suicide was caused by pain, depression or despair resulting from a work-related injury so severe as to override rational judgment.

*McPeake*, 553 A.2d at 440–41 (citations omitted). We also note that this Court, in resolving *McPeake*, observed that "[a]n attorney, **unlike a hospital or mental health professionals**, has no special expertise or professional training, that would enable him either to foresee that a client is likely to commit suicide, or, if he could make that determination, to adopt a response to the threat." *Id.* at 442 (emphasis added).

Janerich and Berger argue that only under the three explicit exceptions outlined in *McPeake* (custodial/inpatient treatment, confinement at a correctional facility, and workers' compensation scenarios) can there be any liability arising from suicide. Janerich and Berger Brief at 11-32. The trial court finds *McPeake* to be readily distinguishable from the facts as alleged here. Trial Ct. Op. at 12-14. We agree with the trial court that *McPeake* does not place the plaintiff's theory of liability off-limits. *McPeake* is factually distinct not only because it is a legal malpractice case that explicitly distinguishes between the lawyer-client and doctor-patient relationships (*McPeake*, 553 A.2d at 442) but because *McPeake* does not involve an allegation that the decedent repeatedly articulated a worsening course of

suicidal ideation. Nor does it describe a defendant who explicitly took on the responsibility for caring for an individual suffering such a worsening course. Thus, **McPeake** cannot provide the final word on potential liability on the facts as pled.

At this stage, the record is not developed to the extent that it adequately informs the Court as to how the medical field currently structures standards of care for patients reporting the symptoms suffered by the decedent. The allegations in this case include that the decedent explicitly informed his care providers that his condition was worsening and that he was contemplating suicide. Trial Ct. Op. at 5, 6 ("[d]uring this period . . . Colangelo learned that Decedent was suicidal, had guns in his home, and had a plan to harm himself . . ." "Decedent presented to . . . Janerich, reporting depression, and on the second of these visits also reporting thoughts of self-harm."). This case also includes an allegation that at least one of the decedent's care providers, Colangelo, reassured the decedent's family that he had a treatment plan ("Colangelo expressly told Decedent and Decedent's family that [he] would help Decedent and guide him through this difficult time"). Thus, the allegations, if taken as true (which they must be, at this stage), include that Colangelo explicitly took on the responsibility of seeing the decedent through his mental health crisis. Colangelo then, per the complaint, coordinated this undertaking with Janerich and Berger.

Sometimes our speech and behaviors give rise to duties that might not otherwise inhere. Janerich and Berger, like Colangelo, focus almost

exclusively on the pure legal question of whether, in the abstract, there is a duty to prevent suicide outside of a custodial relationship. That focus overlooks the fact-specific possibility that, by assurances made to the decedent and his family, Colangelo, Janerich, and Berger assumed a duty to do what they said they would do. It also obscures the allegations that the decedent reported alarming symptoms, and at times told them explicitly that he was contemplating self-harm or suicide. *See* Second Amended Complaint, 2/13/20, at 9, 11, 13, 14.

Just as there are standards of care relevant to patients presenting with chest pain, there are standards of care that medical professionals apply when patients present with thoughts of self-harm or suicide. Of course, there would be a different set of considerations if Colangelo, Janerich, and Berger had custodial control over the decedent at the time of his death. Nonetheless, it would be contrary to public policy to apply a legal malpractice case in such a way as to provide blanket immunity, regardless of the facts, where a physician has chosen not to initiate custodial care for a patient reporting thoughts of suicide. This would provide an obvious and perverse incentive to reduce one's own potential liability by eschewing commitment to an inpatient facility (whether voluntary or involuntary) where the patient's needs call for exactly the opposite response. As stated *supra*, it is premature to view the question of liability as settled without an opportunity to explore the relevant medical standards.

Because we cannot conclude that the trial court erred in overruling preliminary objections, and because Janerich and Berger have not cited any law that forbids liability under the specific facts as pled, we must affirm the trial court's application of the standard for preliminary objections, which is quite stringent.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  8/24/2021